**GERTRUDE PARKER, Inc. v. ABRAMS et al.**

**No. 4433.**

United States Court of Appeals
First Circuit.

Dec. 6, 1949.

Seymour P. Edgerton, Boston, Mass. (Charles S. Bolster and Bingham, Dana & Gould, Boston, Mass., on the brief), for appellant.

Thomas H. Walsh, Boston, Mass. (Leo F. Glynn, Boston, Mass., on the brief), for appellees.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and CLIFFORD, District Judge.

WOODBURY, Circuit Judge.

The diesel powered fishing vessel Skilligolee, outward bound from Gloucester on a fishing voyage, collided almost head-on in the open sea about 25 miles northeast by east of Cape Cod Light with the similarly powered fishing vessel Gertrude Parker, inbound from the fishing grounds to Boston. The collision occurred in a thick fog at about 10:30 o'clock in the evening of June 5, 1946. As a result of it the Gertrude Parker immediately began to fill and in about ten minutes sank, becoming with her cargo a total loss except for her two dories valued at $50 in which her crew escaped. The Skilligolee was damaged in the collision but nevertheless managed to pick up the crew of the Gertrude Parker and return to port.

On June 25, 1946, a libel in admiralty was filed against the Skilligolee and her owners by the appellant as owner of the Gertrude Parker for the loss of that vessel, her cargo of approximately 85,000 pounds of fish, and the personal effects of her crew. And, on November 20, 1946, the appellant filed a petition under 46 U.S. C.A. § 183 for the limitation of its liability in the premises to the value of the salvaged parts of its vessel; the two dories mentioned above.

The appellees as the owners of the Skilligolee answered this petition and then at once filed a petition of their own for exoneration from all liability arising out of the collision, or, in the alternative, limitation of their liability to the value of their interest in their vessel etc. After interlocutory proceedings which do not call for recitation these petitions came on for trial together in the court below, at which time it seems to have been understood by the court and proctors for the parties that the appellant's original libel, although proceedings therein had been stayed in the appellees' limitation proceeding, was also before it for trial. At any rate the court below after hearing found that the collision did not occur through any fault on the part of the owner of either vessel, or through any faulty navigation of the Skilligolee, but was caused solely by the faulty navigation of the Gertrude Parker. Therefore it concluded that the owners of the Skilligolee were entitled to exoneration, that the owner of the Gertrude Parker was entitled to limitation of its liability to the value of the two dories, and that the latter's libel in admiralty against the Skilligolee should be dismissed. The pres-

ent appeal by the owner of the Gertrude Parker is from the final decree entered in accordance with these conclusions.[1]

On this appeal, and apparently throughout this litigation, the proctors for the Gertrude Parker with commendable candor have freely conceded that their vessel was at fault for the collision in two important respects—failure to have a look-out stationed on her bow, and failure to reduce her speed in the thick fog which prevailed when the collision occurred. Their position here, and their position below, is that the Skilligolee was also at fault in that she was unseaworthy to the knowledge of her owners and that she was improperly navigated. Wherefore they contend that the appellees' petition for exoneration or limitation of liability ought not to have been granted, and that their libel in admiralty ought to be remanded to the court below for an assessment of damages and entry of a decree dividing them equally.

It appears from the clear testimony and the findings of the court below based upon adequate evidence that the collision occurred under the following circumstances:

The Skilligolee left Gloucester at about 4:30 p. m. on the day of the collision bound for fishing grounds in the vicinity of Georges Bank. She took a course of southeast by east from Eastern Point and proceeded at her full cruising speed of 8 to 9 knots. The sea was smooth, the wind calm and the weather clear. But at about 9:30 p. m. she encountered heavy fog whereupon her master reduced her speed to 5 or 6 knots and the man at her wheel began to sound fog signals in accordance with Article 15(a) of the International Rules. 33 U.S.C.A. § 91. She had a look-

---

1. In the actual decree it is ordered, adjudged and decreed, inter alia, "That the claim of the Gertrude Parker, Inc., be and it hereby is dismissed." It is not altogether clear whether this refers to the claim for damages embodied in the latter's libel in admiralty against the Skilligolee and her owners, or to the claim for damages filed by the Gertrude Parker, Inc., in the Skilligolee's petition for exoneration from or limitation of liability. But this is not important since the issue of the right of the owner of

the Gertrude Parker to recover damages resulting from the collision was before the court, either in its libel or in the claim it filed in the Skilligolee's petition, and that right has been adjudicated and finally determined adversely to the Gertrude Parker. If, technically, no final judgment has ever actually been entered in the libel, no doubt it will be done, and from the outcome of the exoneration and limitation proceedings it is a foregone conclusion what that decree will have to be.

out posted on her bow, who appears to have been alert and to have had no other duties, and her regulation navigation lights were in proper order and lit. Her master, after checking these arrangements, went below to his quarters under the pilot house where he remained until just before the collision.

The Gertrude Parker left Georges Bank about noon on the same day bound for Boston with her cargo of fish. She took a course of west northwest and proceeded at her full cruising speed of 8 to 9 knots which was maintained until just before the collision occurred. At about 10 p. m. she encountered fog but did not reduce her speed and the court below found on conflicting evidence that she did not immediately start sounding her fog signal. As she entered the fog bank, and thereafter until the vessels were in collision, one man was at her wheel, another man was beside him in the pilot house aft on look-out, and a third man, an engineer, was on duty in her engine room. Her master went below to have a "mug up" before she entered the fog and remained there until a moment or two before the collision.

The first intimation by any one that the vessels were approaching one another came when the look-out on the Gertrude Parker heard one of the Skilligolee's fog signals. He told his watch mate at the wheel beside him that he thought he "heard something", and the helmsman, saying he would "soon find out", sounded a blast of several seconds duration on the Parker's whistle. This blast brought the master of the Gertrude Parker on deck and immediately thereafter the look-out saw the Skilligolee's lights a little to starboard of dead ahead. The look-out shouted "haul her over" to the helmsman, who immediately complied, by swinging her bow to port, and the signal was given to her engineer to reverse and go full speed astern. He did so with all possible speed, but nevertheless the two vessels collided, the stem of the Skilligolee striking the starboard side of the Gertrude Parker about ten feet aft of her stem.

The long blast of the Gertrude Parker's whistle just mentioned was heard by the look-out on the bow of the Skilligolee and gave the first intimation to any one on that vessel that another was in the vicinity. The look-out immediately ran a short distance aft shouting to the helmsman "I hear a whistle ahead" and then turned to return to his post. As he turned he saw the lights of the Gertrude Parker dead ahead and thereupon he shouted "Hard astarboard" to the helmsman, who immediately complied. He then started forward but failed to reach his post on the bow before the collision occurred.

We do not need to consider the causal faults of the Gertrude Parker, except incidentally, for they are conceded. Our primary concern is with the Skilligolee, her construction, her manning and equipment, and her navigation. Our first consideration is her seaworthiness.

The appellant contends that she was unseaworthy to the knowledge of her owners in the way she was constructed, and in the inadequacy of her crew.

■ It appears without dispute that the exhaust pipe of the Skilligolee's diesel engine terminated about five feet forward of her pilot house and about on the level of the roof of that structure. This, the appellant contends, made it difficult for the helmsman to hear either hails from his own look-out or the whistle signals of other vessels. In our opinion this contention cannot prevail for the reason that the evidence does not bear out the contention that the exhaust was noisy enough to interfere appreciably with the helmsman's hearing. Most of the witnesses who testified on the point made light of the noise of the exhaust as an interference with hearing in the pilot house. One of the fishermen on the Skilligolee, however, did go so far as to say that "it would bother you some", and the captain of that vessel on cross examination declined to say whether one in the pilot house could hear as well with the exhaust where it was as he might if the exhaust were aft. This is the strongest testimony in support of this contention of the appellant's, and the witness who said the exhaust "would bother you some" weakened his statement by saying that although some diesel engines "are

bang, bang, bang, bang," the one on the Skilligolee "has got more of a purr to her." It seems to us that this testimony is altogether too weak to warrant a finding that the Skilligolee's exhaust was noisy enough to render her unseaworthy.[2]

The other argument with respect to the unseaworthiness of the Skilligolee involves the competency of her captain and the adequacy of her engine room staff in view of the way she was built. She had only one engineer on board, who of course could not stand watch continuously, and her captain had issued orders that he alone was to order engine changes, and only he or the engineer had authority to handle the engine itself. Thus, although there was a throttle in the pilot house and a lever therein to throw out the sailing clutch connecting the engine to the propellor shaft, neither could be used by the man at the wheel without first obtaining authority from the captain. Furthermore the engine could not be reversed from the pilot house, but could only be reversed in the engine room. It is argued that this construction, particularly with respect to the ability to reverse only in the engine room, required the presence of at least two engineers on board to make the vessel seaworthy, and it is also argued that the captain's standing order forbidding any one to direct engine changes except himself shows conclusively that the captain was incompetent, and hence that the vessel was not seaworthy in this respect as well.

▇▇ We do not pause to consider whether or not the Skilligolee was unseaworthy with respect to her crew because if she was unseaworthy in that respect, her fault therein was non-causal. Even though the Skilligolee, after her look-out's first hail, was allowed to continue on at her reduced speed of 5 or 6 knots "until a moment or two after the collision", as the court below

found, it was not because it was impossible, by reason of her construction, or the inadequacy of her engine room force, or the standing orders of the captain, to stop her sooner. The evidence, and the only evidence, is that the captain heard his lookout's first hail of "I hear a whistle ahead", and that upon hearing it he instantly ascended the six steps leading from his quarters to the pilot house where he found the helmsman putting the wheel over, and that he was there in charge ready to handle the engine in so far as it could be handled from the pilot house in a matter of seconds, and that the engineer, who had been with the captain in his quarters, at the same time went to the controls in the engine room only five or six feet away and was instantly at his post ready to answer signals if any should be given. If there was fault in not throwing out the sailing clutch sooner, or in not stopping and reversing the engine at once, it was not because the vessel was inadequately manned in view of her construction, or because the captain, through incompetence, had ordered that the man at the wheel could not make or even signal for engine changes—it was because of negligent failure on the part of the master in charge of the Skilligolee to give the proper orders; a matter we shall consider presently. In short, the answer to this argument with respect to unseaworthiness is that if the Skilligolee was unseaworthy in the matter of her crew, it cannot be found that the defect was causal.

We come, therefore, to the question of negligence in the way the Skilligolee was handled just before the collision took place.

The appellant's first contention is that the Skilligolee's speed of 5 or 6 knots was too fast in view of the low visibility prevailing at the time of the collision. The argument is that application of the accepted test of ability to bring her to a stop in

2. The evidence of an expert witness offered on behalf of the Gertrude Parker to the effect that other vessels having exhausts arranged like the Skilligolee's had been changed because the noise of their exhausts interfered with the helmsman's hearing was properly rejected by the court below, if for no other reason, because of the absence of any offer to show that the size of the vessels referred to, and other pertinent features of their construction, made them comparable to the Skilligolee, or that their diesels had more of a "purr" to them than a "bang bang, bang, bang."

half the visible distance ahead, conclusively establishes that her speed was not the "moderate speed" required of vessels in a fog by the first paragraph of Article 16 of the International Rules for Navigation at Sea. 33 U.S.C.A. § 92.[3]

The visibility at the time of the collision was variously estimated by the witnesses who testified on the point at from 25 yards to 200 feet. It is obvious, therefore, that the Skilligolee, even at her reduced speed, could not be stopped in her share of the visible distance ahead, for it is the undisputed testimony that even acting with the utmost dispatch, her engine could not be reversed and brought up to full speed astern in less than half a minute. But this does not conclusively establish that her speed was immoderate.

■ The "visible distance" test of moderate speed" under the Rule, although useful in many situations, and frequently applicable, is not a universal one to be applied blindly. It is very generally applied in crowded waters, even though its application may require vessels, other than ferry boats to which special considerations apply, to remain moored or at anchor. But it would hardly be reasonable to apply it in such a way as to require a vessel to drift without steerageway in open waters, or to anchor in exposed or dangerous places. Furthermore, so far as we can ascertain, the test has only been applied when there was knowledge, actual or constructive, of the presence of other vessels in the vicinity. See The Sagamore, 1 Cir., 247 F. 743, 750. And, it has been found on adequate evidence which we are not disposed, if we are at liberty, to question, that the Gertrude Parker's whistle was not sounded until the vessels were in the jaws of collision, and the record does not indicate whether the collision occurred in much frequented waters or not.

■ Of course, a vessel's speed in a fog, mist, falling snow or heavy rainstorm may be immoderate even though the "test of sight" is inapplicable to her. Certainly a vessel would not be justified, except by the most extraordinary circumstances, in not reducing her speed at all in conditions of low visibility. The specific rule of moderate speed in a fog, to say nothing of the general rule of prudent navigation, art. 29 of the International Rules, supra, 33 U.S.C.A. § 121, requires moderate speed in conditions of low visibility regardless of whether the "visible distance" test of moderate speed is applicable or not. But aside from that test, we are not disposed to say that the Skilligolee's speed was immoderate. We lack data on her maneuverability,—how fast she would answer her helm, or could be stopped, loaded as she was at the time of collision; whatever her loading may then have been—and data as to how frequented the waters were when and where the collision occurred. Under these circumstances we are not prepared to say that her speed of five, or even six knots through the fog was not the moderate speed required by art. 16, supra.

■ Moreover, since the Gertrude Parker's conceded faults were gross, we are not called upon to scrutinize the Skilligolee's conduct minutely, or to draw doubtful inferences against her, to discover if she also may not have been at fault. The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; Steffens v. United States, 2 Cir., 32 F.2d 206, 208; General Seafoods Corporation v. J. S. Packard Dredging Co., (The Exeter-Trim) 1 Cir., 120 F.2d 117, 119, and cases cited.

But the appellant contends that the Skilligolee was clearly at fault for failure to comply with the second paragraph of Art. 16 of the International Rules which provide: "A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over." And it says that this clear fault on the part of the Skilligolee, even though it may have contributed only

---

3. "Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard

to the existing circumstances and conditions."

 

slightly to the collision, necessitates an equal division of the damages between the two vessels.

 It was found on adequate evidence, and we accept the finding, that the Skilligolee's engine was not stopped immediately upon hearing the prolonged blast on the Gertrude Parker's whistle, but was allowed to run until a moment or two after the collision. And we concede that if this constituted a fault on the part of the Skilligolee it was a clear one, even though it played only a minor role in bringing about the disaster, and hence requires division of damages. The Exeter-Trim, supra, and cases cited.

 Estimates of time speed and distance by lay witnesses are notoriously inaccurate. Nevertheless, considering all the testimony with respect to the visibility and the speed of the vessels, particularly the conceded speed of the Gertrude Parker, it is abundantly clear that only a very short interval of time elapsed between the sounding of the blast on the latter vessel's whistle and the collision. It may even be that that interval of time was too short for the helmsman of the Skilligolee to put the wheel over, naturally his first thought in the sudden emergency which confronted him, and then to throw out the sailing clutch, if he had dared to disobey his captain's standing orders. But however this may be, when the Skilligolee's master ascended into the pilot house a matter of seconds only after he heard his lookout's first hail, he was confronted with a sudden dire emergency, not of his own making but caused by the Gertrude Parker's speed and her failure to sound the fog signals required by law, for even when the Parker whistled the vessels undoubtedly were in the jaws of collision. He therefore had to decide on the instant whether to obey the command of Art. 16, supra, and instantly stop his engine, thereby losing maneuverability, or whether to depart from the specific provision of Art. 16 and keep his engine going in order to maintain his ability to dodge quickly out of the Gertrude Parker's path. And this choice of action was open to him for Art. 27 of the International Rules, 33 U.S.C.A. § 112, permits

departure from a specific rule when such departure is "necessary in order to avoid immediate danger." Perhaps the captain's judgment was right and he took the better course, i. e., if he had attempted to stop, and failed, the collision would have occurred more nearly head-on and both vessels would have been lost, perhaps with loss of life. But even if his judgment was faulty, that error is not chargeable to him because of the emergency caused by the Gertrude Parker's faults in which he was called upon to act. We do not see how in the emergency which confronted him the master of the Skilligolee is to be charged with fault in departing from the specific command of Art. 16, second paragraph, and instead keeping his engine going and swinging his vessel to starboard in an effort to make the port to port passing required of steam vessels meeting end on, or nearly end on, by Art. 18 of the International Rules. 33 U.S.C.A. § 103.

Other contentions advanced by the appellant have been considered, but in so far as they are not answered by the foregoing discussion we do not regard them as requiring comment.

The decree of the District Court is affirmed with costs in this court to the appellees.