STANDARD OIL CO. v. POCAHONTAS
STEAMSHIP CO.

The ESSO ARUBA.

The ISAAC T. MANN.

No. 4629.

United States Court of Appeals
First Circuit.

June 9, 1952.

Raymond T. Greene, New York City (Thomas H. Walsh, Boston, Mass., Ira A. Campbell and Kirlin, Campbell & Keating, New York City, on brief), for appellants.

Charles S. Bolster and Bingham, Dana & Gould, Boston, Mass. (Miles Wambaugh and Seymour P. Edgerton, both of Boston, Mass., on brief), for Pocahontas Steamship Co. and The Isaac T. Mann, appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

The steam collier Isaac T. Mann, owned by Pocahontas Steamship Company, and the steam tanker Esso Aruba, owned by Standard Oil Company, collided on May 18, 1948, in a dense fog in the East Passage of Narragansett Bay somewhere between Gould Island and Rose Island. At the time of collision the Mann was outward bound in light trim on a voyage from Providence, Rhode Island to Hampton Roads, Virginia, and the Aruba carrying a cargo of fuel oil was inbound for Providence on a voyage from the Dutch West Indies. The contact between the vessels was not severe, only a slight shock of collision being felt on either vessel. Neither vessel was seriously damaged, no person on either vessel was injured, and when the fog lifted an hour or so after the collision both vessels, which had been riding at anchor, proceeded on their respective voyages after each had ascertained that the other was not in need of assistance.

Some five months after the collision Pocahontas Steamship Company as the owner of the Mann libeled the Aruba, her engine, boats, tackle, apparel and furniture, in a cause of collision civil and maritime, for the damages sustained by its vessel in the collision, and in due course thereafter Standard Oil Company, as the claimant and owner of the Aruba, answered and filed a cross-libel for the damages which it had likewise sustained. The libel and cross-libel were tried together in the District Court on oral testimony, depositions and exhibits such as charts, logbooks, bell books, etc.

That court, finding the collision and the damages resulting therefrom due solely to the fault and neglect of the Aruba and those in charge of her, entered a final decree dismissing Standard Oil Company's cross-libel, and an interlocutory decree in Pocahontas Steamship Company's original libel adjudging that it recover its damages in full and referring the question of the amount of those damages to a master. Subsequently the amount of Pocahontas Steamship Company's damages was agreed upon and a final decree was entered below adjudging that it recover the agreed amount with costs and interest. A motion by Standard Oil Company to allow reargument and for additional findings of fact was denied and it thereupon appealed from both of the final judgments entered against it. Its appeals were docketed in this court by our permission as a single case and are before us upon a consolidated record.

It is not contended on these appeals that the Aruba should be absolved of any blame whatever for the collision. The contention is that the Mann was also at fault so that damages should be divided between the owners of the vessels in accordance with the established rule of maritime law. For adequate consideration of the contention it is necessary to give a brief summary of the

facts as found by the court below and as established by indisputable evidence.

The Mann left her dock in Providence at or soon after 6 A. M. Eastern Daylight Saving Time, the time which will be used hereinafter, on her voyage to Hampton Roads. Her captain was a licensed pilot for the waters involved and he was on the bridge conning his vessel. With him at all times was a watch officer and also a quartermaster steering the vessel. The Mann headed down the Providence River on an ebb tide, and after clearing the docks she proceeded at her full speed of about twelve knots on various courses down Narragansett Bay. The visibility was good, estimated as a matter of miles, and about two hours after leaving her dock, that is to say at 8:07, Gould Island was abeam to starboard. At about that time the captain observed haze with a fog bank behind it rolling in from sea, and he posted a lookout on the bow. A minute later at 8:08 he put his engine on half speed as a precautionary measure, and at 8:09 as a further precautionary measure he put his engine on slow speed. In addition between 8:09 and 8:10, after maneuvering to avoid a fishing vessel, he began to sound the statutory fog signal of single blasts on his whistle at intervals of not more than one minute although at the time visibility ahead was about half a mile. At 8:11, soon after his vessel entered the fog, the captain of the Mann heard fog signals from some vessel ahead, the position of which he did not know, and he ordered his engine stopped. Then at 8:12 he put his engine on half astern to reduce his headway still further, and seconds thereafter the Aruba loomed out of the fog ahead but slightly on his port bow, some 600 to 800 feet distant, on a course almost the opposite of his but one which would take the Aruba across his bow diagonally from port to starboard. At that juncture the Aruba blew a two-blast signal calling for a starboard to starboard passing and immediately thereafter the Mann blew a one-blast signal which those on the Aruba took as a "crossing" of their passing signal and an invitation by the Mann for a port to port passing, but which the court below found was intended for, and was in fact, only another fog signal which the Mann was sounding as the vessels came in sight of one another in the fog.[1] At any rate, upon sighting the Aruba, the captain of the Mann put his engine at full speed astern, gave a three-blast signal to indicate what he had done, and then sounded a four-blast danger signal and dropped his port anchor. Almost immediately thereafter the Mann, which the court below found was moving at the time at ½ knot, came into contact with the starboard side of the Aruba at about the latter's bridge. The stem of the Mann scraped along the Aruba's side for some twenty feet and then the vessels separated, apparently because of sternway acquired by the Mann. After the collision the Aruba disappeared in the fog and anchored some two miles away. The Mann remained at anchor at, or in the immediate vicinity of, the place of collision. When the fog lifted an hour or so later the vessels, having ascertained that neither needed assistance, proceeded on their voyages.

We turn now to the Aruba. She arrived in the vicinity of Brenton Reef Lightship at approximately 7:08 and there picked up a pilot licensed for Narragansett Bay. The visibility at the time was a matter of miles and she proceeded on her voyage at full speed conned by the pilot, and with her captain, a watch officer and a helmsman on the bridge, and a lookout on the bow. At 7:51 she arrived at what are known as The Dumplings at the mouth of the East Passage of Narragansett Bay and there was overtaken by fog rolling in from the sea. Her engine was put on "standby," i. e. her engine room crew were alerted to watch closely for signals from the bridge, and at 8:04 upon hearing the fog signals of a tug with a tow somewhere ahead her engine was stopped. She passed the tug and tow starboard to starboard and while doing so the pilot warned the master of the tug of fog down the bay and advised him to anchor. The Aruba then at 8:06 her time,

---

1. Passing signals are short blasts whereas the fog signal is a longer one of four to six seconds duration.

which was one minute slower than the Mann's, proceeded on her way up the East Passage at her half speed of five or six knots, it being considered by the pilot unwise to anchor until he arrived at a safe anchorage east of the channel farther up the Bay.

Some four minutes later a fog signal from some vessel ahead the position of which was not ascertained was heard by those in charge of the Aruba, and at 8:11 they heard another similar signal. On hearing the second signal the Aruba's engine was stopped and immediately thereafter the Mann was sighted a point and a half on the Aruba's starboard bow and heading a little toward her. Visibility at the time was between 500 and 800 feet and the pilot of the Aruba said he was soon aware that the Mann's engine was in reverse, and that he knew that on vessels of the Mann's type this engine maneuver would have a tendency to swing the vessel's bow to starboard. At this juncture the Aruba sounded her two-blast signal for a starboard to starboard passing which was followed immediately by the Mann's one-blast signal interpreted on the Aruba as a "crossing" of its signal and an invitation by the Mann for a passing port to port but which the court below found was intended by the Mann for, and was in fact, a fog signal. The Aruba at once sounded a four-blast danger signal, and seconds before the collision, when contact between the vessels was imminent, put her engine at full ahead in a last moment but fruitless attempt to "run around" the Mann. After the impact the Aruba continued on her way about two miles to an anchorage where she remained until the fog lifted.

On these facts the court below found the Aruba solely at fault on two grounds: failure to stop her engine on hearing the first fog signal of the Mann forward of her beam, and excessive speed in the fog. With respect to speed the court said:

"I find that this collision would not have occurred if the Aruba had been proceeding at a moderate speed in thick fog. Four or five knots under the prevailing conditions was not a moderate speed. The Mann, on the other hand, had reduced her speed to a point which would have allowed her to stop within her share of the seeing distance after sighting the Aruba if the Aruba had been navigating prudently. If the Aruba had come to a stop upon hearing the first fog signal from the Mann and had thereafter proceeded at a moderate rate of speed, the probabilities are that the collision would not have occurred. It was this failure to exercise reasonable diligence which was the cause of the collision."

Without directly challenging these findings, proctors for the Aruba contend that the Mann should also be charged with causal fault in four respects.

██ First they say that she waited too long before starting to sound fog signals. They say, and proctors for the Mann concede, that although Article 15(a) of the Inland Rules, 33 U.S.C.A. § 191(a), read literally requires fog signals by vessels only when actually in a fog, mist, falling snow or heavy rain, nevertheless the courts have repeatedly held that the signals required by the Rule must be given by vessels even when they are not themselves in fog if fog is so near that there is danger of collision with vessels concealed in the fog. And they say further that it conclusively appears from an entry in the Mann's log that those in charge of her were aware of the approaching fog bank at 8:05 and yet, although they then posted a lookout on the bow and slowed their speed, they did not start sounding fog signals until 8:09 or 8:10, four or five minutes later.

It is true that there is an entry in the Mann's log "8:05 A. M. Lookout Sent on Bow Hazy Ahead", and it is also true that the court below found that fog signals were not blown by the Mann until 8:09 or 8:10. But there is testimony that visibility was two or three miles at the time the log entry quoted above was made and that there was visibility of half a mile when the first fog signal was given. Moreover, the captain of the Mann testified that he did not start blowing the fog signals until he had completed maneuvering to avoid a fishing vessel dragging its gear across his bow in order to avoid the possibility of his first fog signal being mistaken by the fishing vessel for a

passing signal—a sound precaution on his part as is evident from the fact that a subsequent ·fog signal of his was erroneously taken as a passing signal by the Aruba. Under the above circumstances we are by no means prepared to say that the Mann should have started her fog signals any earlier than she did.

Proctors for the Aruba next say that the court below fell into clear error in finding the Mann's speed at the moment of impact to have been only ½ knot, and they submit an elaborate argument based upon a detailed analysis of time, speeds and distances to prove that instead she must have been moving at 5 or 6 knots. We see no need to set the argument out at length or to comment on the accuracy, or inaccuracy, of the data upon which it rests. It is enough to say first, that the pilot of the Aruba himself estimated the speed of the Mann at the moment of collision as ½ knot, and second, that without any doubt at all the shock of collision was slight and neither vessel was seriously damaged, and that considering the fact that the stem of the Mann struck the starboard side of the Aruba at an angle of approximately 45 degrees and the further fact that the vessels soon separated because of sternway on the Mann, it is inconceivable that the Mann could have had more than bare headway at the moment of collision. If her speed had been greater common sense indicates that her bow would have been crumpled instead of her stem only bent slightly to one side, and that a gash would have been cut in the Aruba's side instead of only damage to the starboard wing of her bridge and a twenty odd foot scrape along her side.

Proctors for the Aruba further contend that the Mann's lookout was wholly incompetent and that his incompetence was a contributory cause of the collision. It is true that the lookout on the Mann was an ordinary seaman with little experience and that he reported nothing from the time he took his post for the reason, he said, that he saw and heard nothing until he saw the Aruba ahead at about the time the Mann's anchor was being dropped. Obviously a report of the Aruba ahead at that time would add nothing to what those in charge of his vessel knew. But it is contended that the Mann's lookout must have heard, and hearing ought to have reported, the fog signals given by the Aruba before she came into sight, and being lower down, he ought to have seen the Aruba, had he been alert, before those on the Mann's bridge. Thus it is said that the Mann's lookout was no better than no lookout at all and the court's finding of no causal fault on the part of the lookout on either vessel cannot stand as far as the Mann's lookout is concerned. We do not agree.

It is true that the lookout on the Mann was an ordinary seaman with little experience. It does appear, however, that he had been instructed as to his duties, and there is no indication that he was not alert or that he was performing any other duty than that of lookout. He may not have heard the Aruba's fog signals at all, as he testified, for it is well known that sound carries uncertainly at best in a fog, and the officers on the Mann's bridge heard the signals made by the Aruba before she came into sight only faintly. Thus it may well be that he not only did not but could not have heard the Aruba's fog signals. His failure to see the Aruba before she was seen by the bridge personnel of the Mann, although he was nearer to her, can be explained by the fact that the fog was low-lying and the latter therefore from their point of vantage higher up had the better opportunity to see, as the court below found. We do not think the Mann can be charged with causal fault for an inadequate lookout.

Proctors for the Aruba make the further contention that the Mann should be charged with fault for violating the "Narrow Channel" rule embodied in Art. 25 of the Inland Rules, 33 U.S.C.A. § 210, wherein it is provided:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

In the first place it is not clear that the collision occurred in a "narrow channel" within the meaning of the Rule. There is

evidence of some substantial movement across the East Passage in the vicinity of the place of collision by fishing vessels, ferries and small boats, as well as movement up and down the Passage by incoming and outgoing vessels of all sizes, see The No. 4, 2 Cir., 1908, 161 F. 847, 850 and furthermore in The Lexington, 2 Cir., 1921, 275 F. 279, 284, it was held that the East Passage at a point somewhat below the place where the collision must have occurred was not a narrow channel.

In the second place, even if the collision did occur in a narrow channel covered by the Rule a question we do not attempt to decide on the rather vague and meager evidence before us, it is not at all clear that the Mann was navigating on her wrong side of the channel.

Because of the dense fog it was not possible to fix the actual point of collision by taking the visual bearings of landmarks at the time. However, the Mann dropped her anchor at, or just before the collision, and bearings, although not very accurate ones, were taken of her position as soon as the fog lifted and before she resumed her voyage which would seem to place her on the wrong side of the channel. These bearings are said by the proctors for the Aruba definitely to fix the point of collision and to establish that the Mann was in violation of the Rule. We do not agree.

The bearings in question were taken by the mate of the Mann while she lay at anchor after the collision. There is no doubt as to that. But both the mate and the master of the Mann testified that as soon as the Aruba disappeared into the fog after the collision, they raised their anchor intending to follow to see if the Aruba was in need of assistance, but hearing fog signals from other vessels in the vicinity, gave up the attempt as too hazardous "after drifting for some little while." How far the Mann drifted in that indefinite interval, and in what direction the tidal currents carried her, are matters pretty much of guess work and must remain so. And since the East Passage between Gould Island and Rose Island is only about 600 yards wide between anchorage areas, for all that we can tell, assuming the bearings to be accur-

ate, the collision could have occurred on the Mann's starboard side of mid-channel and she drifted to her port side of the channel while her anchor was up and her captain was considering whether he would follow the Aruba or not.

But the proctors for the Aruba contend that the testimony of the master and mate of the Mann that her anchor was raised and that she was allowed to drift after her anchor was first dropped just before the collision must be wholly disregarded for the reason that there are no entries to corroborate their testimony in the bridge log, and no entries of engine movements in the engine room log which would certainly appear had the anchor been raised as testified to because once it was dropped it could not be raised again without moving ahead on the engine to slacken tension on the anchor chain. There is no testimony to support the assertion that movement ahead on the engine was necessary in order to raise the anchor. And certainly we cannot take judicial notice that such was the fact. Thus for all that we know the anchor could be raised by the anchor winch alone, and if this were so the lack of any notation of engine movement in the engine room log is explained. Lack of entry in the bridge log may have been due to oversight, or raising the anchor and dropping it again may have been thought too trivial a maneuver to note. Although log entries, or lack of them, are certainly highly persuasive, we cannot under the present circumstances regard the logs as wholly controlling and in consequence entirely disregard the oral testimony that the Mann was allowed to drift for some indeterminate time following the collision and before she came to anchor a second time. Hence we cannot take the bearings as establishing beyond question that the place of collision was on the Mann's port side of mid-channel.

Indeed there is some evidence indicating the contrary for the pilot of the Aruba testified that just before the collision he passed an outbound tug and its tow starboard to starboard, and also a navy tug towing a target, and that soon after the collision he passed two outward bound tank-

ers also starboard to starboard. This would tend to place the Aruba on the wrong side of the channel instead of the Mann.

■ At any rate, we cannot fix the place of collision as on the easterly side of the channel without resolving doubtful inferences against the Mann and this we are not disposed to do in view of the clear faults of the Aruba. Gertrude Parker, Inc. v. Abrams, 1 Cir., 1949, 178 F.2d 259, 264, and cases cited. Moreover, the Aruba having asserted the fault of the Mann in this respect had the burden of proving its assertion, and it must be obvious from the foregoing that this she has failed to do.

The judgments of the District Court are affirmed, with costs on appeal.