**GULF OIL CORPORATION, owner of SS GULFOIL, Libellant,**

v.

**UNITED STATES of America, Respondent.**

Petition of S. E. GRAHAM CO., as owner, and Graham Transportation Co., Inc., as bareboat charterer of the M/V S. E. GRAHAM, for exoneration from or limitation of liability.

**Nos. 1805, 1802.**

United States District Court
D. Rhode Island.

Jan. 10, 1969.

Leo F. Glynn, of Glynn & Dempsey, Boston, Mass., Morgan J. Burke, Jr., of Dorsey, Burke & Griffin, New York City, for libellant.

William E. Gwatkin, III, Dept. of Justice, Washington, D. C., Edward P. Gallogly, U. S. Atty., Providence, R. I., for respondent.

Benjamin F. Stahl, Jr., of Clark Ladner, Fortenbaugh & Young, Philadelphia, Pa., Harold E. Staples, and Benjamin A. Smith, of Tillinghast, Collins & Tanner, Providence, R. I., for petitioner.

## OPINION

DAY, Chief Judge.

These proceedings in admiralty arise out of a collision between the M/V S. E. Graham and the S. S. Gulfoil on August 7, 1958, between 6:52 A.M. and 6:53 A.M. (Eastern Daylight Saving Time) in a dense fog in the East Passage of Narragansett Bay, between Bull Point, Jamestown and Fort Adams, Newport, in the State of Rhode Island. As a result of said collision and the resulting fire, eighteen persons were killed, many persons were injured and both of said vessels were badly damaged.

On August 8, 1958, Gulf Oil Corporation, owner of said Gulfoil, filed in this Court a petition for limitation of liability under the provisions of the Shipown-ers' Limitation of Liability Act, 46 U.S. C. §§ 182–189 (Admiralty No. 1800) and on August 15, 1958, S. E. Graham Co., as owner, and Graham Transportation Co., Inc., as bareboat charterer of said S. E. Graham filed a similar petition for limitation of liability (Admiralty No. 1802).

Thereafter, on December 1, 1958, Gulf Oil Corporation, as owner of the Gulfoil, filed suit against the United States of America under the provisions of the Public Vessels Act, 46 U.S.C. §§ 781–790, in the United States District Court for the District of Maine. On January 15, 1959, said suit was transferred to this Court. In this suit (Admiralty No. 1805) the libellant seeks to have its losses sustained as a result of said collision shared by the United States under the admiralty rule of divided damages in collision cases where both vessels are found to have been at fault. In its libel it alleges that certain faults of the United States Coast Guard Cutter Laurel contributed to said collision. In its answer the United States asserts that the Laurel was not at fault in any respect; that the sole cause of said collision was the gross and major faults of the Gulfoil or the mutual faults of both the Gulfoil and the S. E. Graham, and, further, claims that it is entitled to limit its liability, if any exists, under said Shipown-ers' Liability Act.

In addition the United States has, by way of a claim asserted in Admiralty No. 1802, filed what is in substance a third-party complaint against the said S. E. Graham Co. and Graham Transportation Co., Inc. contending that if there is to be a division of damages between Gulf Oil Corporation and the United States, then the faults of the S. E. Graham should be considered and that the United States should be entitled to recovery over from said S. E. Graham Co. and said Graham Transportation Co., Inc.

By agreement of the parties, Admiralty No. 1805 and said claim of the United States in said limitation proceeding

(Admiralty No. 1802) were consolidated for trial.

The credible evidence and the reasonable inferences to be drawn therefrom, in my opinion, establish the following facts. At between 6:52 A.M. and 6:53 A.M. (EDST) on August 7, 1958, the Gulfoil collided with the S. E. Graham in a dense fog in the East Passage of Narragansett Bay between Fort Adams on the east and Bull Point on the west. The East Passage is the principal passage through Narragansett Bay, the approach from the Atlantic Ocean to the City of Providence, in the State of Rhode Island. At its entrance from seaward the East Passage is bounded on the east by Aquidneck Island on which the City of Newport is located, and on the west by Conanicut Island on which is located the Town of Jamestown. Approximately in the middle of said East Passage, there is a small island, known as Rose Island.

Navigational aids mark a natural channel through said East Passage which lies between Rose Island and Jamestown. Down-bound from Providence to the sea the general course turns 25 to 30 degrees to the left or east opposite Rose Island and continues in a direction slightly to the west of due south for a distance of about 2,000 yards to a point where said East Passage narrows between Fort Adams on the left or descending side and Bull Point on the right at which it turns about 50° to the right. Below Fort Adams said East Passage widens, passing between Castle Hill on said left descending side and Southwest Point until it reaches the open sea opposite Beavertail Point on said Conanicut Island.

The East Passage is approximately 1,600 yards wide between Fort Adams and Bull Point.

On August 7, 1958 and prior thereto, the west side of said Passage in this area was marked by Bull Point Lighted Bell Buoy No. 1 which designated Bull Point and the right-hand side of the channel for down-bound navigation. Said buoy was set out about 500 yards from Bull Point, well removed from the shoals there and around The Dumplings, so-called, a number of small rocks and islands protruding north and east of Bull Point. Between said Bull Point Buoy to a point 50 feet west of Fort Adams, the channel was approximately 800 yards wide.

The Bull Point Buoy was a black bell buoy, 16 feet high, placed in 156 feet of water. Its characteristics were a green flashing light, flashing every 5 seconds with a flash of 1 second duration. It was not a turn marker, and carried no radar reflector.

At approximately 5:31 A.M. (EDST) the United States Coast Guard Cutter Laurel left Bristol, Rhode Island on a mission to service aids to navigation in said East Passage. She was a diesel-powered Coast Guard Buoy Tender and was 180 feet long. Her first order of business was to replace said Bull Point Buoy by another buoy of the same type to permit routine overhaul thereof.

The Laurel was commanded by Lieutenant Commander John D. McCann, who had been a Coast Guard Officer for 14 years and Captain of the Laurel for more than 1 year. He had had extensive experience with fog navigation off the coast of Maine and in the summer of 1957 as Captain of the Laurel had been engaged in servicing aids to navigation in Narragansett Bay. His operations officer on the Laurel was Lieutenant Junior Grade John H. Manningham who had been on the Laurel for more than 2 years, had had extensive experience in fog and radar navigation and has served as navigator on the Laurel when she was servicing aids to navigation in Narragansett Bay during the summer of 1957.

When the Laurel left Bristol and proceeded down Narragansett Bay the weather was relatively clear with some haze and a visibility of between 2 and 4 miles. As the Laurel was proceeding down Narragansett Bay and had not reached Rose Island, a down-bound tanker, later identified as the Gulfoil, was observed by some of the crew of the Laurel. When first observed, she was,

according to Captain McCann, astern of the Laurel at a range of about 5,000 yards. At this time the Laurel was on a course of about 200 degrees true, making a speed of about 12 knots. When the Laurel was opposite Rose Island the range to the Gulfoil had decreased to between 1,000 and 1,200 yards.

As the Laurel passed Rose Island there was a noticeable reduction in visibility and members of its crew observed a heavy fog bank lying about half way between Rose Island and Bull Point Buoy, approximately 1,000 yards below Rose Island. At this time Captain McCann began sounding fog signals, reduced the speed of the Laurel to 8 knots and with Rose Island about 750 yards to port brought the Laurel to a new course of 172 degrees true.

Shortly thereafter he ordered his fog navigation team into operation. The Laurel's radar was kept under constant observation and a lookout was posted on her bow. With visibility becoming more limited, Captain McCann decided that no work would be done on the Bull Point Buoy under the then existing conditions.

At about 6:43 A.M. (EDST) the Laurel ran into very thick fog, visibility being reduced to about 50 yards. Captain McCann began a further continual reduction in the speed of the Laurel. Meanwhile the fog navigation team had been plotting the Laurel's positions using radar ranges from Fort Adams, Bull Point and Rose Island, and reporting said positions to Captain McCann.

As the Laurel was approaching said heavy fog, Manningham on her radar observed an upbound vessel in the channel north of Castle Hill and south of Bull Point slightly off the Laurel's starboard bow at a range of approximately 2,000 yards. When the Laurel entered the heavy fog, the Gulfoil had already made the turn at Rose Island and her range from the Laurel was observed to be about 900 yards and appeared to be closing.

The Gulfoil was later observed on the radar of the Laurel and her track ap-

peared to be more easterly than that of the Laurel, her course being 5 to 10 degrees less than the 172° course of the Laurel. Continued radar observation of the Gulfoil by Manningham revealed that the ranges between the Gulfoil and the Laurel were decreasing and that the Gulfoil was beginning to pass up the Laurel's port side.

Captain McCann then being aware that a vessel was coming up the channel and that the Gulfoil was gaining on the Laurel, decided that the Laurel should leave said channel so that said vessels could pass each other in a normal meeting situation. As soon as the bearings of the upbound vessel, later to be identified as the S. E. Graham, passed dead ahead of the Laurel's bow, Captain McCann brought the Laurel to the right with right rudder to head in the direction of said Bull Point Buoy. At this time, the speed of the Laurel was about 3 knots and said buoy was on a true bearing of 187 or 188 degrees, at a range of about 750 yards, and the S. E. Graham was about 1,000 yards dead ahead and the Gulfoil was coming down on the Laurel's port quarter at a range of less than 750 yards.

Captain McCann, using varying amounts of right rudder, steered the Laurel toward said buoy, intending to sight it visually and go beyond it in order to move the Laurel out of the channel. As the Laurel was heading toward said buoy, Captain McCann continued with a constant reduction of her speed until she was making steerageway at a speed of not more than 2 knots.

While the Laurel was proceeding in this manner said buoy came into sight of those on the Laurel about 10 degrees off her starboard bow at a range of between 75 and 100 yards at about 6:51 A.M. (EDST). Upon sighting said buoy, Captain McCann then ordered more right rudder, intending to pass the buoy close aboard to port and to proceed from the channel into the waters west of said buoy. The Laurel passed the buoy at a range of 20 to 25 yards in a slow swing to the right at a speed of 1 or 2

knots. By the time the Laurel had come to a heading between 250 and 260 degrees, she was very nearly stopped to the west and north of the buoy with her stern about 20 yards west of the buoy and outside said channel.

While the Laurel was swinging to the right as aforesaid, Manningham observed the radar images of the Gulfoil and the S. E. Graham coming together and merging into a combined target on the Laurel's radar at a range of 500 yards on his port quarter at a relative bearing between 200 and 210 degrees. While the Laurel was swinging to the right and had passed the buoy Captain McCann heard the sound of the collision between the Gulfoil and the S. E. Graham. He brought the Laurel to a stop. At this time the Laurel was on a heading between 250 and 260 degrees north and west of said buoy, with the buoy off her port quarter at a range of 20 to 50 yards. She remained in this position for less than two minutes. Upon hearing the cries of men who were in the water, Captain McCann then backed the Laurel from her westerly heading and she proceeded in an easterly direction past said buoy on her starboard side out into the channel to rescue the survivors of said collision.

While the Laurel and Gulfoil were coming down the East Passage, the S. E. Graham was proceeding into said East Passage from the sea. The S. E. Graham was a small diesel powered coastal tanker and was 250.6 feet in length. She was fully loaded with about 21,000 barrels of gasoline and had left Newark, New Jersey, on the evening of August 6, 1958, for Providence, Rhode Island.

The S. E. Graham was under the command of Captain Karl L. Anderson who had assumed her bridge watch about 5 A.M. (EDST) when the vessel had entered heavy fog. As the S. E. Graham approached said East Passage, her fog signals were being sounded regularly and her radar was in normal operation. When the S. E. Graham was passing Castle Hill, Captain Anderson changed her course to steer for a light at the upper end of Goat Island.

As the S. E. Graham continued up the East Passage above Castle Hill on the course heading toward Goat Island, he detected the Laurel on the 2-mile scale of his radar at a range of 1½ miles, a little south of Rose Island, and the Gulfoil at a range slightly more than 2 miles from him somewhat above Rose Island and about 1,000 yards astern of the Laurel. Upon observing these vessels, he changed the course of the S. E. Graham slightly to his right to avoid them when they would make the turn between Fort Adams and Bull Point Buoy. This resulted in changing her course to steer for a light at the tip of Fort Adams.

Following this further change of course, he continued to watch the Gulfoil and Laurel on radar and noted that the Gulfoil was getting closer to the Laurel. He also noted that the Laurel was moving more slowly, was on a course heading toward Bull Point Buoy and that just before she reached said buoy she had come to the right. While making these observations, he concluded that the S. E. Graham was getting too close to the shore at Fort Adams and changed her course to the left thereby turning her toward the down-bound Gulfoil.

As Captain Anderson watched the Laurel approach, the Bull Point Buoy on his radar, the radar image of the Laurel eventually merged with that of the buoy into a single image. He testified that such a merger of images was a common occurrence and that he did not lose the buoy on his radar. When he observed the merger of said images, the S. E. Graham was about 500 yards from said buoy. As Captain Anderson continued to observe the Gulfoil on his radar, he saw it disappear in the sea return which blanked his radar scope out to a distance of about 250 yards. After the Gulfoil was lost in said sea return and less than 250 yards from the S. E. Graham, Captain Anderson heard the Gulfoil sound a backing signal. Captain Anderson then ordered rudder of the S. E. Graham to

hard right and her engines half ahead. As a result he thereby placed the bow of the S. E. Graham in front of the oncoming Gulfoil which collided with the port side of the S. E. Graham about 50 feet aft of the latter's bow. Captain Anderson had finally put the engines of the S. E. Graham in reverse when he saw the Gulfoil about 50 feet away at a relative bearing of 40 to 45 degrees from the port bow of the S. E. Graham but it was then too late to prevent said collision.

The Gulfoil had left East Providence, Rhode Island at 4:45 A.M. (EDST) on August 7, 1958 outbound on a voyage to Port Arthur, Texas. She was a steam powered tanker and was 488.3 feet long. She was empty but with some of her tanks in ballast.

The Gulfoil was under the command of Captain Montrivell Eden and her navigation out of Narragansett Bay was in charge of Borden A. Tuell, a licensed pilot. Captain Eden and Tuell were on her bridge as the Gulfoil proceeded down Narragansett Bay in addition to the normal bridge watch consisting of the chief mate, John F. Smith, and the helmsman, Melvin J. Guidry. An engineering officer and an oiler were on watch in the engine room, and a lookout was stationed on the bow of said vessel.

The Gulfoil approached Rose Island on a course of about 200 degrees true and at a speed of about 13 knots on an ebb tide. It is clear that those on the Gulfoil were aware that the Laurel was dead ahead of her at a range of about 3,200 yards above Rose Island which was reduced to a range of about 1,000 yards after Rose Island was passed. The pilot had been giving all course and speed orders after leaving East Providence and he ordered the speed of the Gulfoil reduced to 8 knots ahead shortly before she passed Rose Island.

The Gulfoil made a turn to the left at Rose Island. At this time the Laurel was disappearing in the fog bank which was about 1,000 yards below Rose Island. The Gulfoil entered heavy fog with near zero visibility about three min-utes later, began to sound regular fog signals, did not stop, but her speed was reduced to slow ahead or approximately 5 knots at 6:45 A.M. (EDST). The order for slow speed ahead came from Captain Eden and not from the pilot.

The radar on the Gulfoil was operating and had been operating normally. The characteristics of that radar were such that it could not distinguish between two objects on the same bearing less than 65 yards apart or between two objects at the same range that were separated by less than 5 degrees of bearing. Two objects within 5 degrees or sixty-five yards of each other would appear as a single image on said radar under normal conditions.

The pilot did not look at said radar at any time after passing Rose Island. Captain Eden was the only person who looked at the radar during this period. He did not keep it under constant observation but went back and forth between it and the forward part of the pilot house and the wing of the bridge. What he may have observed on these occasions remains unknown since he perished in the collision between the Gulfoil and the S. E. Graham.

After the Gulfoil entered the fog, Captain Eden looked at the radar, operated its dials and ordered the chief mate to go out on the starboard wing of the Gulfoil bridge to listen for the sound of said Bull Point Buoy and then also went out on the bridge. After a brief interval he returned to the radar, manipulated its dials again, told the helmsman to tell him when he was on course. He was overheard by the helmsman to say "We usually see him when we get close enough." After that Captain Eden left the radar and the pilot came in. The helmsman heard Captain Eden ask: "Can I pass that buoy on either side" and heard the pilot reply: "Yes, you can shave him on either side." Captain Eden then went out on the wing of the bridge. After a brief interval, he came back, looked at and again operated the radar. After observing it he said "I

wish he would get out of there." He then left the radar and removed his glasses.

Shortly thereafter the pilot came into the wheelhouse and suggested to Captain Eden that the Gulfoil's course should be changed to the right because he was of the opinion that the Gulfoil should then be practically down to said buoy. Captain Eden, according to the testimony, rejected this suggestion and replied "We're not down to the buoy yet. I'll tell you when we get there." Following this conversation, Captain Eden again looked at the radar, manipulating its dials and the pilot returned to the wing of the bridge.

Shortly after this conversation, the pilot returned to report to Captain Eden that he had heard fog signals off the starboard bow of the Gulfoil. Captain Eden then went out on the wing of the bridge and ordered that the engines of the Gulfoil be stopped. This order is recorded in the Gulfoil's engine room bell book as having been received at 6:51 A.M. (EDST).

Captain Eden did not return to the radar. After a lapse of one or two minutes, upon hearing another fog signal ahead, he ordered the engines of the Gulfoil to be put on full speed astern. This order was carried out, but was given too late to avoid a collision with the S. E. Graham which those on the Gulfoil did not see until she was only 10 or 15 feet ahead. It appears that one or two minutes elapsed between the full astern order and the collision, but the Gulfoil had on enough headway to permit her helmsman to control her up to the moment of impact. For the last two or three minutes prior to the collision Captain Eden was on the wing of the bridge and no one was looking at the radar of the Gulfoil.

The Gulfoil never changed her course after making the turn at Rose Island. The helmsman of the Gulfoil did not recall what course he was steering but it is clear that she was on a course of about 166 degrees true and east of the Laurel, with the result that Gulfoil was off course by nearly 10 degrees and was proceeding into the upbound side of the channel of the East Passage and eventually into collision with the upbound S. E. Graham.

The collision occurred about 500 yards east of said Bull Point Buoy between 6:52 A.M. (EDST) and 6:53 A.M. (EDST). At the point of impact the down-bound Gulfoil was not on her own side of the channel which extends 800 yards to the east of said Bull Point Buoy, but was approximately 100 yards to the east of the middle of said channel on the upbound side thereof.

As hereinbefore recited, for the last 2 or 3 minutes prior to said collision no one on the radar of the Gulfoil was looking at her radar. There was no evidence that anyone on the Gulfoil observed the Laurel and said buoy as a merging or combined target.

Libellant contends that the Laurel was negligent in leaving the channel near said Bull Point Buoy in that by so doing radar observation of said buoy by those on the Gulfoil was interfered with, causing the Gulfoil to collide with the S. E. Graham.

In my opinion there was no proof whatever by the libellant that Captain Eden or any other person on the Gulfoil was watching her radar at any time when the Laurel and said buoy were close enough to each other to form a combined radar image. And if such a merger of images had occurred and was observed, there is no proof that it in any way affected the navigation of the Gulfoil in any respect.

The navigation of the Gulfoil was in charge of a licensed pilot who was responsible for determining her course and speed. Ralli v. Troop, 1895, 157 U.S. 386, 15 S.Ct. 657, 39 L.Ed. 742; Union Shipping & Trading Co. v. United States, 1942, 2 Cir., 127 F.2d 771. The pilot was not using radar, and consequently whatever may have been the effect of the Laurel's conduct upon the presentation on the Gulfoil's radar, it clearly did not influence any decision of

her pilot who did not observe it. Captain Eden was only observing said radar on occasion, not continuously. For the last 2 or 3 minutes prior to the collision, no one on the Gulfoil was looking at her radar.

Similarly, there is no showing by the libellant that the conduct of the Laurel in proceeding toward said buoy did affect or hamper the navigation of the Gulfoil in any respect. Her course had been set approximately 10 minutes earlier when she passed Rose Island. The Gulfoil continued on this course to the point of collision which was 500 yards east of Bull Point Buoy. Additionally, it cannot be said that if at any time the image of the Laurel merged with that of said buoy this fact obscured radar observation of the S. E. Graham by those on board the Gulfoil.

█ In the instant case it is clear beyond question that the Gulfoil was guilty of faults which were sufficient to cause said collision. Under the circumstances, it is not enough for the libellant to raise a doubt as to the propriety of the conduct of the Laurel. The City of New York, 1893, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; Navigazione Alta Italia v. Keystone Shipping Company, 1966, 5 Cir., 365 F.2d 422; Standard Oil Co. v. Pocahontas S. S. Co., 1952, 1 Cir., 197 F.2d 422; Gertrude Parker, Inc. v. Abrams, 1949, 1 Cir., 178 F.2d 259.

In the City of New York case, supra, the Supreme Court held 147 U.S. at page 85, 13 S.Ct. at page 216:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

It cannot be said that the Laurel owed any duty to the Gulfoil to remain in said channel and thereby assume the risk of being run down by the Gulfoil which had been overtaking her, or any duty not to approach said Bull Point Buoy. With her radar unable to differentiate between two objects 65 yards or 5 degrees in bearing apart, the merging of radar images must have been a common occurrence to the navigators of the Gulfoil as it was to other navigators. The navigators of the Gulfoil could and should have kept the Laurel under constant radar observation as she headed in the direction of said buoy, and were bound to anticipate that the radar images of the Laurel and said buoy would' probably merge. But it is clear beyond any doubt that none of the navigators of the Gulfoil looked at her radar during the 2 or 3 minutes immediately prior to said collision.

It is significant that Captain Anderson of the S. E. Graham observed the merger of the images of the Laurel and said buoy on the radar of the S. E. Graham and knew where the Laurel was and the relative position of said buoy to the S. E. Graham.

█ In my opinion the libellant has failed completely to prove that the Laurel in leaving said channel obstructed or interfered in any manner with the navigation of the Gulfoil, or caused her to collide with the S. E. Graham. In the absence of such proof, the libellant is not entitled to the relief it seeks herein. Accordingly, its libel must be dismissed.

Finding as I do that the libellant is not entitled to any relief against the respondent, there is no occasion for me to consider the contingent claim asserted by the respondent against S. E. Graham Co. and Graham Transportation Co., Inc. in said limitation proceeding. (Admiralty No. 1802).

Counsel for the respondent will prepare and present for entry a decree in accordance with the findings and conclusions hereinbefore set forth.