## THE LAURENCE.

### NEW YORK, P. & N. R. CO. v. THE LAURENCE.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1893.)

#### No. 37.

COLLISION—STEAMER WITH BARGE AT ANCHOR—FOG—EXCESSIVE SPEED.

A coal barge was anchored for several days in the west side of the channel of the Elizabeth river, Virginia, at a place designated by the harbor master, and customarily used as an anchorage for many years. The channel was 450 yards wide for 18-feet water and 600 yards for 12-feet water, and there was at least 200 yards of sea room east of the barge. During a dense fog the barge was struck by a steamer making a regular run at about her usual speed of 15 miles per hour. The officers of the steamer were aware of the position of the barge, and were on the lookout for her, and those on the barge, on hearing the steamer's approach, gave frequent signals by bell and horn. The steamer was out of her usual course, and out of the part of the channel generally used by passing vessels. *Held*, that the steamer was in fault for maintaining excessive speed in a fog, thus violating Act Aug. 19, 1890, c. 802, art. 16, § 1.

Appeal from the District Court of the United States for the Eastern District of Virginia.

In Admiralty. Cross libels for collision by the New York, Philadelphia & Norfolk Railroad Company against the barge Laurence, and the Thames Towboat Company of New London against the steamer New York. Decree for the Thames Towboat Company. The New York, Philadelphia & Norfolk Railroad Company appeals. Affirmed.

Robert M. Hughes, for appellant.

Samuel Park, for appellee.

Before BOND and GOFF, Circuit Judges, and SIMONTON, District Judge.

GOFF, Circuit Judge. About 8:45 o'clock in the morning of the 9th day of March, 1891, during a dense fog, a collision took place in the Elizabeth river below the Lambert's Point coal piers, the steamer New York running into and sinking the barge Laurence. The steamer was owned by the New York, Philadelphia & Norfolk Railroad Company, and the barge by the Thames Towboat Company of New London. The steamer was bound from Cape Charles to Norfolk, and the barge was at anchor, laden with coal. The steamer was damaged, and the barge and her cargo lost. Cross libels were filed in the district court of the United States for the eastern district of Virginia at Norfolk. They were tried before the judge of that district, who dismissed the libel against the barge Laurence, and passed a decree in favor of the Thames Towboat Company, libelant in the cross bill. From the decree dismissing its libel the New York, Philadelphia & Norfolk Railroad Company appealed.

The claim of the appellant is that the barge was anchored in an improper place and manner, and that proper signals of her presence were not given. The questions involved (mostly questions of fact) are to be determined as we find the weight of the evidence to be

relative to the location of the steamer and barge in the channel, and the rate of speed the steamer was making when she was informed of the presence of the barge, as well as the width of the channel at the point where the collision occurred, and the character and frequency of the signals given by the barge. We have carefully considered the testimony, and, while it on some points is contradictory, we find that its weight decidedly sustains the conclusions reached by the judge who heard the cases, and before whom the witnesses were examined. As to the contention that the barge was anchored in the channel, in an improper place, and without proper authority, we find that about 30 vessels were so anchored on the west side of the channel at the time the collision occurred. These vessels had been so placed, by and under the direction of one who had been acting as deputy harbor master at Norfolk for years. The west side of the channel at that point had been so used for years, and this custom, then well established and understood, was well known to those navigating that channel, and going in and out of the port of Norfolk. The Laurence had been for several days in the position she was on the morning of the collision, and the steamer New York was aware of the fact that the barge was so anchored. It appears that the steamer was on the lookout for the barge, and the latter, hearing the steamer approaching, was giving signals advisory of her presence. The fact that the custom of anchoring on the west side of the channel existed and was well known by the steamer and the barge, and the further fact that the steamer was fully advised as to the location of the barge, make quite a different case from the one argued by counsel for appellant, who dwelt with much force upon the dangers to navigation occasioned by the unauthorized and improper anchoring of vessels in channels necessarily used by steamers in going in and out of our ports. Had the location been unusual and without authority—the anchoring of the barge an isolated circumstance at an unaccustomed place—of which the steamer was not informed, then it would have been entitled to serious consideration in connection with the question of the liability of the barge.

Why did this collision happen? Where was the fault? Could the steamer have passed the barge safely with the use of due care and necessary caution? We think so. The Laurence was lashed to another barge, the Puritan, which was considerably larger, and was also laden with coal. They were on the western side of the channel of the river, which at that place was 450 yards wide for 18-feet water and 600 yards wide for 12-feet water. The Laurence drew about 12 and the Puritan 13 feet, and they were at anchor in about 36 feet of water. The barge was struck in her starboard quarter by the steamer, which cut into her 5 or 6 feet, wedging the vessels so firmly together that it required the power of the engines of the steamer and a tug to pull them apart. The evidence shows that the men on the barges were using a bell and a horn, frequently ringing and blowing them as signals, in the dense fog then prevailing in the channel where the vessels were anchored. The officers of the steamer were aware that the barges were at

anchor, and were advised as to the locality they so occupied. There was at least 200 yards of sea room east of the barges, used by vessels in going in and out of the port of Norfolk. It was the duty of the steamer, in motion, to steer clear of the barges, at anchor. The steamer was evidently moving at a greater rate of speed than was proper under all the circumstances. A crowded harbor and a dense fog should at least suggest more care and less speed. The steamer ran in connection with the railroad, and had her schedule time. She drew 9 feet at rest and 11 feet at full speed, and was a screw boat 210 feet in length. She made the run from Cape Charles to Craney island, in the fog, at her usual rate of speed, about 15 miles an hour. As to her speed at the time she struck the barge the evidence is conflicting, but we have no difficulty in finding from it that she was moving in disregard of the law in such case made and provided, and the regulations issued in pursuance thereof. She was bound to observe unusual caution, and to maintain only such a rate of speed as would enable her to come to a standstill by reversing her engines at full speed, before she should collide with a vessel which she should see through the fog. This is the rule laid down by the supreme court of the United States in the case of The Colorado, 91 U. S. 692, 702. See The Nacoochee, 137 U. S. 330, 11 Sup. Ct. Rep. 122.

It is also evident from the evidence that the New York was, at the time of the collision, out of her usual course,—out of that part of the channel generally used by passing vessels. This was doubtless owing to the dense fog, and it was this mistake that brought her into collision with the Laurence. For the reasons we have given we find the steamer liable for the damages to the barge, and the decree of the district court is affirmed, with costs.