**PETITION OF the UNITED STATES of America as Owner of the USNS HAITI VICTORY, for exoneration from or limitation of liability.**

No. 7622.

United States District Court
E. D. Virginia, Norfolk Division.

May 5, 1955.

Thomas F. McGovern, Dept. of Justice, Washington, D. C. (L. S. Parsons, Jr., U. S. Atty., John M. Hollis, Norfolk, Va., Asst. U. S. Atty., Edward B. Hayes, Chicago, Ill., Dept. of the Navy, David C. Wood, Dept. of Justice, Washington, D. C., on the briefs), for the United States.

Edwin Longcope, New York City, and Edward R. Baird, Norfolk, Va., for intervening claimant, British Transport Commission.

William B. Eley, David H. Batchelder, Jr., Leon T. Seawell, Jr., R. Arthur Jett, C. Lydon Harrell, Jr., and John W. Oast, Jr., Norfolk, Va., for other intervening claimants.

BRYAN, District Judge.

Just before dawn in the North Sea on May 6, 1953, the USNS Haiti Victory, headed for Bremerhaven, and the westbound S.S. Duke of York, an overnight ferry between the Hook of Holland and Harwich, England, collided. The Duke of York had just emerged from a fog; the Haiti Victory was running in clear weather. Minor damage was suffered by the Haiti Victory, but her stem so deeply knifed into the port side of the Duke of York, just forward of her bridge, that the entire bow of the latter fell off and sank. Several of her 437 passengers were killed, others injured, and a large number lost their personal baggage. As owner of the Haiti Victory, the United States of America has filed a petition for exoneration from or limitation of liability. The question is whether either or both vessels failed to observe the care and caution enjoined upon mariners, by seamanship and statute, for the prevention of collisions at sea.

Asking $1,500,000 for her damage, the British Transport Commission, operating the Duke of York in connection with the British railway system, has led in the effort of the claimants to lay responsibility for the accident to the Haiti Victory. Petitioner's right to limitation, as well as the limitation fund of $1,039,959.52, has been established without contest. Certain claimants sought, through impleading petitions, to assert and try in this proceeding the liability of the British Transport Commission to them; the attempts were rejected and the immunity of the Commission thereto in the present forum was sustained. Ascertainment of the quantum of damages has been deferred in each instance to the determination of liability.

The Duke of York, a twin-screw steam turbine oil burner, 339 feet in length, left the Hook of Holland bound for Harwich a few minutes after midnight May 5, 1953 (early morning of May 6). She had a maximum speed of 18–20 knots and the crossing was normally a matter of five hours. Her lane was slightly south of due west—W ¼ S., 267° magnetic—and took her about a mile south of Galloper Lightship, located off the English coast some distance north of the Thames' mouth. The Hook and Harwich are nearly on the same parallel, a little below the 52nd N. The Duke was showing all required navigation lights—two steaming lights forward, masthead and mainmast, a stern light, and red and green side running lights. Her equipment included radar, but the instrument failed before the ship was twenty minutes out. In addition to her regular officer complement, she carried a Dutch pilot all the way across.

The Haiti Victory is a single-screw propeller, of the Victory ship type, 439 feet in length and equipped with radar. She took on a licensed British pilot at Dover just after 0117 British Summer Time, which was one hour ahead of Greenwich Mean Time and is the time of the references herein. Up to Galloper Lightship her course was generally 022° at first, and then 024°, gyro. Passing on her port hand the South and East Goodwin Lightships enroute, she came abeam of Galloper at about 0414 BST. After an alteration of her course to 050° gyro, to go under the stern of a crossing vessel, when 1½ miles to the east of Galloper, the Haiti Victory settled on a firm course of 036° gyro. She was maintaining her maximum speed, 17–18 knots, and was showing all requisite lights.

The Haiti Victory's first notice of the Duke's presence was the latter's fog whistle just after 0414 hours. It was caught by the Haiti Victory's forward lookout, and immediately reported to the bridge, as being off the starboard bow. Her pilot had heard it too. Instantly he passed to the starboard door of the wheelhouse, scanned the darkness from bow to beam, saw nothing and went directly to the radar. It disclosed a target on his starboard bow. Going again to the starboard wing of the bridge and again seeing nothing, he at once stopped his engines—0415 hours. Within a moment the red light of the Duke appeared on his starboard bow, but ½ mile off; thereupon the Haiti's rudder was put Hard Right, her engines Full Astern, and her whistle given a short blast. At 0416 the ships were together.

Aboard the Duke, the captain heard a whistle four or five points on her port bow—the blast of the Haiti as she went Right Rudder and Full Astern. About the same time his forecastle-head lookout shouted his observation of the Haiti's masthead light, as well as her green light, ¼ mile away, about 6 points on the port bow. While taking a "fix" from the Decca dials in the wheelhouse, the Duke's second mate heard the lookout's call, and running out on the port wing picked out the Haiti's green light with his binoculars, his radar being inoperable. At once the master put the Duke's engines on Slow, manually sounded a prolonged blast on her whistle, and followed it with Full Astern and 3 short blasts. Collision ensued.

The collision was two miles east of Galloper. The prow of the Haiti Victory penetrated the port bow of the Duke of York on the foreside of her bridge. The Haiti Victory puts the time at 0416, the York at 0418 hours. No fault is found in the engine or wheel movements of either vessel after they became aware of each other. Agony of collision was upon them and avoidance was then impossible. Existence or absence of earlier fault becomes a question of whether for the weather then prevailing the conduct of either vessel constituted negligence in navigation; therefore, the primary and crucial inquiry is what was the weather as known, or as it ought to have been known, to the two navigators.

A meteorological cold front was moving over the North Sea, from northeast to southwest, on the very early morning of the collision, May 6, 1953. It seemed

to be pivoting on a point to the north of the east coast of England. By illustration, at midnight, GMT, along the English coast the weather was favorable, and was as favorable along the European coast as far north as the Hook of Holland; from midnight until 4 o'clock A.M. BST it moved southwardly 60 miles along the Dutch coast, but only 20 to 30 miles along the English shore. As a "weak" front it included only drizzle, overcast and fog with very poor visibility. At 4 o'clock BST it was still 60 miles northeast of Galloper, but twice as far down the European coast as on the opposite coast. From 4 o'clock until 7, it was almost stationary on the English side, leaving fair visibility there, but the night was dark. In and around Galloper the weather at 0300 hours was "cloudy with wet dew", meaning on Galloper's log legend that the moon or stars would be visible at times. Fog signals were not commenced by Galloper until 0445 (the collision was at 0416 or 0418) and not until 0600 was it overcast and misty at Galloper. "Misty * * * is not quite as thick as [fog] but enough to cause objects to be indistinct and to require the fog signal to be sounded." The frequency of the fog and the low visibility increased from Galloper toward the Dutch coast.

From the time the Duke left the gas buoy, the first sea point, off the Hook of Holland, she met fog. As early as 12:45 A.M., less than an hour after leaving the docking pier, her captain was called to the bridge on account of the fog. At Noord Hinder Lightship, off the Dutch coast and 9 miles south of the Duke's track, the log records the weather as foggy from one A.M. to five. The Duke was running through a "patchy" fog—"very thick at times" and then fairly clear intervals. She was piercing one fog bank after another. Fog signals from the vessel's steam whistle were sounded continually. From 3 A.M. on, the fog was "very thick". This is the testimony of the Duke's crew. The fog pocket she transited immediately before the collision was apparently the westernmost in her course.

In such weather the speed of the Duke of York was too fast for good seamanship; it violated the "moderate speed" injunction in the fog rules of Article 16, International Rules, 33 U.S. C.A. § 145n. It was an overriding and major fault; collision was a foreseeable result. Enveloped repeatedly throughout her passage in a fog that severely cut visibility, and rendered her invisible, she nevertheless assumed and kept to her clear weather speed—she reached Galloper at her regularly scheduled hour. When on the bridge at 12:45 A.M., the captain reduced the engines to Half Speed, 12 knots, but within a few minutes he put them back on Full Speed, 18 knots, and returned to his cabin evidently satisfied with the visibility. Never was visibility greater than 1 or 2 miles. From 0053 until 0325 hours her engines were at Full Speed Ahead. Twenty-four miles east of Galloper, 0325, visibility was shorter than a mile; by 0412, six minutes before the collision, it was less than half a mile; but during this period, save for a minute, her speed was 16 knots, Standby Full Ahead. At 0412 and up to the collision, visibility was ¼ mile, the captain, his mate and lookout have said, and even in this interval the speed was 12 knots, Half Ahead. Not until the Haiti Victory was sighted, the ships ¼ mile apart, and the collision a minute or two off, did the engines go to Slow, 6 knots.

Obviously, too, the Duke was not conforming to the authoritative interpretation of Article 16—that speed in a fog shall not exceed a rate that would allow her, with the assistance of her engines, to come to a standstill before she would collide with another vessel that she should see. The Laurence, 1893, 4 Cir., 54 F. 542, 544; The Silver Palm, 1937, 9 Cir., 94 F.2d 754, 757; Griffin on Collision, p. 292 et seq.; The Fjell, 1919, D.C.E.D.Va., 257 F. 478, 480, opinion by Judge Waddill. Indeed, she could

not stop in time to allow the bow watch to get below to warn his companions. That 12 knots in a fog of ¼ mile visibility is in fact an immoderate speed seems manifest; that it is so in law is well precedented. Griffin on Collisions, p. 301, footnote 1.

■■ As to fault in the Haiti Victory, decision depends on whether she knew or ought to have known that she was running into or alongside a fog bank. If she had such knowledge, actual or attributable, and if the fog rules bind a vessel approaching or running alongside a fog, she was at fault; for she was proceeding at full speed, 17–18 knots, and was taking no fog precautions. But the Court finds that she was neither in a fog nor chargeable with notice of the nearby fog patch. It cannot be successfully argued that, with the Duke so near, the Haiti Victory must necessarily have been aware of the fog enshrouding the Duke. The evidence denies any such deduction. The fog cloaking the Duke hid her as effectively as it hindered her; and all the while remained imperceptible to the outsider.

As the Haiti left Dover, visibility was excellent, so clear that the radar was soon switched off. Lights were distinct on both sides of the Channel, ahead and astern. One vessel was overtaken on the way, readily discernible. At 0400 Galloper was easily picked up one point on the port bow. Just before the Haiti came abeam of Galloper, still another vessel was seen, running from Goeree Lightship, on the Holland coast and a little south of the Hook, to Harwich. The Haiti Victory altered her course to 050° to give way to the crossing vessel, went around her stern, and resumed her plotted course on 036°. The crossing vessel, as indicated, came from the east, the very direction from which the Duke was coming. She was plainly seen when as much as 4 or 5 miles eastward. This was at 0414 hours—2 minutes before the collision. A trawler a mile and a half north of the Duke, and on a parallel course, showed no consciousness of any fog. As we have seen, even Galloper did

not find it advisable to issue fog signals until 0445, and then it did so not for fog, only for "Cloudy Wet dew." Signs of fog were not seen by the Haiti Victory until after the Duke revealed herself. They were not overlooked; they were not there.

To charge the Haiti Victory with knowledge of the proximity of fog, the Duke called to the stand the mate of the S.S. American, a ship following the Haiti Victory up the North Sea. Her course was 034° True. Departing Dover seventeen minutes after the Haiti Victory, the mate said he was able at 0425 to see, 8½ miles on his "port head", the Kentish Knock Light located on the English coast; he stated the visbility was 10 miles. His log contains no entry of bad weather between 0236 and 0441. His notation of fog at 0441 corresponds to Galloper's log of fog signals at 0445; but American's record reveals that fog was only setting in at 0441, that not until then were her engines put on Standby, and only at 0450 was her speed reduced because of fog. He states he could not see Galloper until within ½ mile of it at 0506, but his log notes that the American came abeam of Galloper at 0508 with 3 miles visibility. Hence, he gives no proof of fog perception on the English coast as early as 0416 or 0418—collision times. When 1½ miles passed Galloper, at 0512, he saw the Duke and the Haiti lying alongside each other fore and aft.

■ True, the Haiti Victory's master did not completely undress on turning in, staying ready for any call, including a fog alarm. He testified, too, of the frequency of fogs in the North Sea. But, all of this discloses precaution against fog, not suspicion of it. Of course, he knew that ships traversed the North Sea between the English and Dutch ports; but he had the right to assume that their presence would be announced through the signals, and would be accompanied by the seamanship, demanded by the laws of the sea. Admittedly, as to the westbound traffic his was the burdened vessel, they the privileged; but again their paramount rights presuppose their ob-

servance of the law. Failing in this, their priority is forfeited. Specifically, compliance with the fog rule was a prerequisite to assertion of the righthand vessel's crossing privileges.

Strenuous insistence of fault in the Haiti Victory is urged for her failure to make use of radar, particularly, when the Haiti Victory's mate had glanced into the radar at Galloper. The assertion is plausible but actually unsubstantial. After the Goeree-Harwich vessel had crossed and passed down the port side of the Haiti Victory, the second mate turned on the radar. His purpose was to get his distance off Galloper. It was turned on just as the Haiti Victory was changing back from her passing course of 050° to the new course of 036°. He did not see the Duke on the PPI (planned position indicator) repeater scope, though probably there was a pip on the right half of the scope. But he was not looking for anything to starboard; he had no reason to go to the radar to search in any direction. His failure to see the Duke was not negligence, for it was not the result of neglect of an obligation. No obscurity obligated him to use his radar, and there was nothing else to put him on notice of any need for it.

At this point it is well to refer to the Duke's radar. Its use would have avoided the collision and its unavailableness was due to neglect of repair. There was ample warning—a day or two—of its disrepair. Had it been in operation, the situation so urgently demanding its services, omission to use it would clearly have been negligence. However, as the Duke of York's excessive speed was the predominant fault leading to the collision, it is not necessary in this case to pass upon the question of whether or not, in the absence of statute requiring radar, a lack of diligence in maintaining existing radar facilities is negligence.

This memorandum is adopted by the Court as its findings of fact and conclusions of law. Within 10 days proctors for the United States will present a decree exonerating the petitioner, but they shall first submit it to the claimants' proctors for consideration as to form.