230 F.2d 139
 BRITISH TRANSPORT COMMISSION et al., Appellants,
v.
UNITED STATES of America, as owner of THE U.S.N.S. HAITI VICTORY, petitioning for exoneration from or limitation of liability in a cause of limitation of liability, civil and maritime, Appellee.
 No. 7102.
 United States Court of Appeals Fourth Circuit.
 Argued January 7, 1956.
 Decided February 13, 1956.
 
 Edwin Longcope, New York City (Baird, White & Lanning, Norfolk, Va., McNutt & Nash, New York City, and Edward R. Baird, Norfolk, Va., on the brief), for appellant British Transport Commission.
 Wilbur E. Dow, Jr., New York City (John W. Oast, Jr., David H. Batchelder, Jr., Norfolk, Va., Dow & Symmers, New York City, Vandeventer, Black & Meredith, Hughes, Little & Seawell, Jett, Sykes & Howell, C. Lydon Harrell, Jr., and Earl W. White, Norfolk, Va., on the brief), for appellants intervening claimants.
 Thomas F. McGovern, Atty., Department of Justice, Washington, D. C. (L. S. Parsons, Jr., U. S. Atty., Norfolk Va., Leavenworth Colby, Atty., Department of Justice, Washington, D. C., and John M. Hollis, Asst. U. S. Atty., Norfolk, Va., on the brief), for appellee.
 Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.
 DOBIE, Circuit Judge.
 
 
 1
 On May 6, 1953, in the very early morning, a collision occurred in the North Sea between the overnight ferry Duke of York (hereinafter called the Duke) owned by the British Transport Commission (hereinafter called the Commission), and the transport Haiti Victory (hereinafter called the Haiti), owned by the United States. Terrific damage was done to the Duke, several persons on the Duke were killed, others were injured and many suffered property damage. The Haiti suffered only minor damages to her bow, amounting to some $60,040.48.
 
 
 2
 A petition was filed in the United States District Court for the Eastern District of Virginia by the United States, as owner of the Haiti, seeking exoneration from and/or limitation of liability for all losses and damages resulting from the collision. The Commission filed in these proceedings a claim of $1,500,000 for the losses and damages sustained by the Duke. Numerous death, personal injury and baggage claimants also filed claims in the limitation proceedings, in varying amounts.
 
 
 3
 Some of the other claimants also filed petitions in the limitation proceedings, seeking to implead the Commission therein under General Admiralty Rule 56, 28 U.S.C.A. In an unreported memorandum, the District Court held that the other claimants could not implead the Commission, for the reason that a limitation proceeding does not provide a forum for the adjudication of the liability of co-claimants to each other. Accordingly, an order was entered in the District Court dismissing the impleading petitions of these other claimants.
 
 
 4
 The limitation proceedings were tried in the District Court before Judge Albert V. Bryan. At the trial the right of petitioner, United States, to limit its liability, as well as the limitation fund of $1,039,959.52, was established without contest.
 
 
 5
 Thereafter, Judge Bryan filed his opinion, Petition of U. S. as owner of U. S. N. S. Haiti Victory, D.C., 131 F.Supp. 712, in which he held that the Duke was solely to blame for the collision. The final decree exonerating the Haiti was filed in accordance with this opinion.
 
 
 6
 The Commission, and the other claimants, have filed appeals from the final decree exonerating the Haiti. The other claimants have also appealed from the order dismissing their petitions to implead the Commission in the government's limitation proceedings.
 
 
 7
 Two questions are before us on this appeal: (1) Did the District Court commit error in exonerating the Haiti and holding the Duke solely to blame for the collision; and (2) Did the District Court commit error in dismissing the petitions of the other claimants to implead the Commission in the limitation proceedings instituted by the United States seeking exoneration from, and/or limitation of liability for, losses and damages resulting from the collision.
 
 
 8
 The fault of the Duke seems quite clear and is not seriously contested. She had left the Hook of Holland bound West for Harwich, England. We quote from the opinion of the District Judge, which finds ample support in the record, 131 F.Supp. 712, 715:
 
 
 9
 "The Duke was running through a `patchy' fog — `very thick at times' and then fairly clear intervals. She was piercing one fog bank after another. * * * From 3 A.M. on, the fog was `very thick'. * * * In such weather the speed of the Duke of York was too fast for good seamanship; it violated the `moderate speed' injunction in the fog rules of Article 16, International Rules, 33 U.S.C.A. § 145n. It was an overriding and major fault; collision was a foreseeable result. * * * At 0412 and up to the collision, visibility was ¼ mile, the captain, his mate and lookout have said, and even in this interval the speed was 12 knots, Half Ahead. Not until the Haiti Victory was sighted, the ships ¼ mile apart, and the collision a minute or two off, did the engines go to Slow, 6 knots."
 
 
 10
 Had the weather been clear and the visibility good all around, under the Starboard Hand Rule, the Duke would have been the privileged, the Haiti the burdened, vessel. This rule, though, did not apply here by virtue of the fog surrounding the Duke.
 
 
 11
 This brings us to the District Court's exoneration of the Haiti, a discussion involving at least three points: (a) Actual or constructive knowledge on the part of the Haiti that she was running into, or alongside, a fog bank; (2) The conduct of the Haiti after the Haiti heard the whistle of the Duke; (3) The negligent use, or failure to use its radar by the Haiti. A careful study of the record convinces us that we cannot reverse the District Court's exoneration of the Haiti.
 
 
 12
 Visibility was excellent as the Haiti, with a Trinity House pilot, left Dover, bound for Bremerhaven, Germany. Lights were distinct on both sides of the English Channel. Around 0400 Galloper Lightship was easily picked up by the Haiti, about one point on the port bow. A very short while before the Haiti came abeam of Galloper, a crossing vessel was seen by the Haiti, about 4 miles away. The Haiti altered her course to 050°, went around this vessel's stern and then resumed her plotted course of 036°. This happened about 0414, approximately 3 minutes before the collision, and this crossing vessel came from the East, the direction from which the Duke was coming.
 
 
 13
 A trawler, about 1½ miles North of the Duke, and on a course practically parallel to the Duke, gave nothing to indicate the presence of fog. Galloper gave no fog signals until 0445, and then signalled only "Cloudy wet dew." The collision occurred about two miles East of Galloper. The mate of the S. S. American, which left Dover 17 minutes after the Haiti, testified that his log contained no notation of fog until 0441.
 
 
 14
 Confirmatory testimony to the effect that there was no fog and no signs of impaired visibility apparent to those on the Haiti was given by her bow lookout, her helmsman and her mate. We must, therefore, affirm the holding of the District Court that the Haiti never knew, nor should have known, of the fog which enveloped the Duke.
 
 
 15
 This brings us to the conduct of the Haiti just prior to the collision. The first notice those on the Haiti had of the presence of the Duke was a single blast whistle from the Duke. The bow lookout of the Haiti promptly reported to the bridge by telephone that he had heard what he thought was a ship's whistle off the Haiti's starboard bow. This whistle was also heard by the helmsman and pilot of the Haiti. The time, then, was apparently about 0414.
 
 
 16
 The pilot dashed out on the starboard side of the wheelhouse, looked around, saw nothing and went to the radar which disclosed an echo off the starboard bow. He again went out, saw nothing and stopped the engines, around 0415. Those on the Haiti thought the single blast they heard was a fog signal, but they were not sure of this.
 
 
 17
 Apparently in about a minute, the Haiti pilot saw the Duke crossing from starboard to port, gave the order hard right, blew one short blast and went full speed astern. The full speed astern was logged on the Haiti at 0415½, the collision at 0416. The Haiti changed course from 036° to 079° before striking the Duke. The pilot of the Haiti testified that when he first saw the Duke looming out of the fog, there was nothing that could be done by the Haiti beyond the hard right and full speed astern. A survey of the deformation of the plates, which is the resultant of the velocities of the ships, showed the speed of the Duke, at the moment of impact, to be from 2 to 4 times the speed of the Haiti.
 
 
 18
 Under these facts, we must affirm the holding of the District Court exonerating the Haiti from blame in its conduct just before the collision. This includes the contention of the Duke that the Haiti violated article 16, 33 U.S.C.A. § 92:
 
 
 19
 "* * * A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."
 
 
 20
 See The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; Johnston-Warren Lines v. United States, 2 Cir., 196 F.2d 689; Steffens v. United States, 2 Cir., 32 F.2d 206; The Anna M. Fahy, 2 Cir., 153 F. 866.
 
 
 21
 This brings us to the radar question. Since the visibility was good, the radar on the Haiti was switched off to stand by about two hours after the pilot boarded the Haiti. At stand by, no images are visible on the radar screen, but the radar is kept heated and, as the pilot testified, "When you do switch it, it comes on immediately." It was proved that the delicate cavity magnetron of the Haiti radar has a short life, so that the actual use of the radar must be carefully rationed.
 
 
 22
 Counsel for the Duke make much of the failure of those on the Haiti to observe the Duke when, for purely navigational purposes, the radar was switched on as the Haiti neared Galloper and the Haiti mate failed to find the Duke on the radar screen. On this point, we quote from the opinion of the District Judge, 131 F.Supp. 712, 717:
 
 
 23
 "Strenuous insistence of fault in the Haiti Victory is urged for her failure to make use of radar, particularly, when the Haiti Victory's mate had glanced into the radar at Galloper. The assertion is plausible but actually unsubstantial. After the Goeree-Harwich vessel had crossed and passed down the port side of the Haiti Victory, the second mate turned on the radar. His purpose was to get his distance off Galloper. It was turned on just as the Haiti Victory was changing back from her passing course of 050° to the new course of 036°. He did not see the Duke on the PPI (planned position indicator) repeater scope, though probably there was a pip on the right half of the scope. But he was not looking for anything to starboard; he had no reason to go to the radar to search in any direction. His failure to see the Duke was not negligence, for it was not the result of neglect of an obligation. No obscurity obligated him to use his radar, and there was nothing else to put him on notice of any need for it."
 
 
 24
 With this, we must concur. See, The Southport, 82 Ll.L.Rep. 862; United States v. The Australia Star, 2 Cir., 172 F.2d 472, 476, certiorari denied 338 U.S. 823, 70 S.Ct. 69, 94 L.Ed. 499; Wood v. United States, D.C., 125 F.Supp. 42, 51; Pocahontas Steamship Co. v. The Esso Aruba, D.C., 94 F.Supp. 486, affirmed Standard Oil Co. v. Pocahontas S. S. Co., 1 Cir., 197 F.2d 422; Anglo-Saxon Petroleum Co. v. United States, D.C., 88 F. Supp. 158; Wylie, Use of Radar at Sea (Institute of Navigation, London, 1953).
 
 
 25
 As to the defective radar on the Duke, the District Judge observed, 131 F.Supp. 712, 717:
 
 
 26
 "At this point it is well to refer to the Duke's radar. Its use would have avoided the collision and its unavailableness was due to neglect of repair. There was ample warning — a day or two — of its disrepair. Had it been in operation, the situation so urgently demanding its services, omission to use it would clearly have been negligence. However, as the Duke of York's excessive speed was the predominant fault leading to the collision, it is not necessary in this case to pass upon the question of whether or not, in the absence of statute requiring radar, a lack of diligence in maintaining existing radar facilities is negligence." This brings us to the second question before us on this appeal: Did the District Court err in denying the petitions of various claimants to implead the co-claimant, British Transport Commission. This right of impleader is sought under the 56th Admiralty Rule:
 
 
 27
 "In any suit, whether in rem or in personam, the claimant or respondent (as the case may be) shall be entitled to bring in any other vessel or person (individual or corporation) who may be partly or wholly liable either to the libellant or to such claimant or respondent by way of remedy over, contribution or otherwise, growing out of the same matter. This shall be done by petition, on oath, presented before or at the time of answering the libel, or at any later time during the progress of the cause that the court may allow. Such petition shall contain suitable allegations showing such liability, and the particulars thereof, and that such other vessel, or person ought to be proceeded against in the same suit for such damage, and shall pray that process be issued against such vessel or person to that end. Thereupon such process shall issue, and if duly served, such suit shall proceed as if such vessel or person had been originally proceeded against; the other parties in the suit shall answer the petition; the claimant of such vessel or such new party shall answer the libel; and such further proceedings shall be had and decree rendered by the court in the suit as to law and justice shall appertain. But every such petitioner shall, upon filing his petition, give a stipulation, with sufficient sureties, or an approved corporate surety, to pay the libellant and to any claimant or any new party brought in by virtue of such process, all such costs, damages, and expenses as shall be awarded against the petitioner by the court on the final decree, whether rendered in the original or appellate court; and any such claimant or new party shall give the same bonds or stipulations which are required in the like cases from parties brought in under process issued on the prayer of a libellant."
 
 The District Judge stated:
 
 28
 "The impleading petitions cannot be allowed. While the limitation of liability statute, as executed by Admiralty Rules 51-54, has been authoritatively interpreted as offering a forum for the complete adjudication and recovery of all claims, the reference is to claims and remedies against the petitioner only. * * *
 
 
 29
 "To permit one claimant to prosecute another claimant in the limitation litigation would be unfair. The latter has intervened under compulsion, the court enjoining his resort to any other tribunal. Therefore, his responsibility should not be enlarged beyond that incident to his claim. Obedience to the injunction should not expose him to an attack to which, in regular course, he would be subject only in the jurisdiction of his residence or other place of voluntary entrance."
 
 
 30
 In his opinion, the District Judge cited, with the admission that none of these cases was precisely in point, Just v. Chambers, 312 U.S. 383, 386, 61 S.Ct. 687, 85 L.Ed. 903; Hartford Accident & Indemnity Co. v. Southern Pacific Co., 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612; Department of Highways v. Jahncke Service, Inc., 5 Cir., 174 F.2d 894; The Clio-The Springhill, 1948 A.M.C. 75.
 
 
 31
 This appears to be a question of first impression. While there have been cases involving the right of a petitioner in a limitation of liability proceeding to implead a claimant therein and the right of a claimant or a petitioner to bring in a third party, there have been no cases that involve the precise issue here involved: Whether one co-claimant in a limitation of liability proceeding can implead another co-claimant under the provisions of the 56th Admiralty Rule.
 
 
 32
 We advert briefly to the cases cited in the District Judge's opinion. In the Hartford Accident and Just cases, supra, the Supreme Court held that when the jurisdiction of the court of admiralty has attached through a petition for limitation, the jurisdiction to determine liability is not lost merely because the shipowner fails to establish his right of limitation, and the claimants will be furnished a complete remedy by distribution of the res and by judgments in personam for deficiencies against the owner. In the Department of Highways case, supra, the impleading petition was denied, but, in that case, it was a third party that was sought to be impleaded rather than a co-claimant which was before the court and thus subject to the court's jurisdiction, as is the Commission in the instant case. In the Clio-Springhill case, supra, the impleading petition was granted, but the party seeking the impleading petition was the petitioner in the limitation of liability proceeding.
 
 
 33
 Though the question is close and not free from difficulty, we think the District Court erred in denying these impleading petitions, which should have been granted. While a hardship might thereby be suffered by the Commission, it would be an even greater hardship on the other claimants if they were left to enforce their rights by independent proceedings. Here we have many claimants from many parts of the world, who have filed their claims in the limitation proceedings instituted by the United States. All of the evidence concerning the collision involved herein has been presented both by petitioner and the claimant, British Transport Commission. The merits of the case have been adjudicated and it would work an undue hardship on all of the claimants herein not to have their rights against the British Transport Commission settled at this time. To hold otherwise would mean that the various claimants would have to pursue their causes of action against the Commission in another forum at great expense and at a time when perhaps much of the evidence necessary to support their claims would have been lost due to the lapse of time.
 
 
 34
 As a practical matter as well as an equitable one, the claimants herein should be allowed to implead the Commission. The Court (United States Court of Appeals, Second Circuit) in Algoma Central & Hudson Bay Ry. Co. v. Great Lakes Transit Corporation, 86 F. 2d 708, stated that a determination in a limitation of liability proceeding will be res adjudicata. This position is also supported by The Adah, 2 Cir., 258 F. 377, wherein the same court stated that all parties to a proceeding for limitation of liability who appear voluntarily or otherwise and join issues with the petitioners and between themselves are bound by the decree. Thus, if the issue of liability in the instant case is res adjudicata and all the parties herein bound thereby, then the District Court should also decide the issue of damages as between all the parties before it and this could only be accomplished by the allowance of an impleading petition under the 56th Admiralty Rule.
 
 
 35
 It has often been said that admiralty courts sit as courts of equity. Certainly wide acclaim has been lavished on the delight of equity in doing complete justice to all the parties before it and here the Commission was before the court. This view was admirably stated by Chief Justice Taft in the Hartford Accident case, 273 U.S. 207, 215-216, 47 S.Ct. 357, 359:
 
 
 36
 "It is quite evident from these cases that this court has by its rules and decisions given the statute a very broad and equitable construction for the purpose of carrying out its purpose, and for facilitating a settlement of the whole controversy over such losses as are comprehended within it, and that all the ease with which rights can be adjusted in equity is intended to be given to the proceeding. It is the administration of equity in an admiralty court. * * * The proceeding partakes in a way of the features of a bill to enjoin the multiplicity of suits, a bill in the nature of an interpleader, and a creditor's bill. It looks to a complete and just disposition of a many-cornered controversy".
 
 
 37
 This equitable principle was stated and applied by the Supreme Court in the case of Alexander v. Hillman, 296 U.S. 222, 56 S.Ct. 204, 80 L.Ed. 192, which was an equity suit brought by receivers of a corporation for the purpose of winding up the affairs of the company and the disposition of its assets. Certain officers of the corporation, who were not served with process, appeared as respondents and presented their claims. The receiver of the company then filed various counter-claims against the officer-respondents and prayed for affirmative relief against them. This affirmative relief was allowed. Said Mr. Justice Butler, 296 U.S. 222, 239, 241-242, 56 S.Ct. 204, 209:
 
 
 38
 "Treating their established forms as flexible, courts of equity may suit proceedings and remedies to the circumstances of cases and formulate them appropriately to safeguard, conveniently to adjudge, and promptly to enforce substantial rights of all the parties before them. * * *
 
 
 39
 "Respondents' contention means that, while invoking the court's jurisdiction to establish their right to participate in the distribution, they may deny its power to require them to account for what they misappropriated. In behalf of creditors and stockholders, the receivers reasonably may insist that, before taking aught, respondents may by the receivership court be required to make restitution. That requirement is in harmony with the rule generally followed by courts of equity that, having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief."
 
 
 40
 The directors were required, at the risk of forfeiting their rights, to comply with the invitation and order of court and present their claims in the receivership proceeding.
 
 
 41
 See, also, the opinion of Circuit Judge Parker, (citing Alexander v. Hillman) speaking for our Court in Florance v. Kresge, 4 Cir., 93 F.2d 784, 786.
 
 
 42
 It is contended by counsel for the Duke that limitation proceedings in admiralty are distinctive and statutory, that they are sui generis and quite unlike suits in equity or ordinary civil actions in admiralty. It is said they are neither proceedings in rem nor in personam. Accordingly, we are told, admiralty courts in such unique and peculiar proceedings should not apply the usual doctrines of equity or admiralty. This technical contention leaves us rather cold. It does not wean us from the liberal view we have reached.
 
 
 43
 Modern codes of procedure have reflected two facets: (1) all rights, if this can fairly be done, should be decided in a single legal proceeding; (2) parties who submit themselves to the jurisdiction of a court in a legal proceeding should be bound by that court's decision on all questions, appropriate to and seasonably raised in, that proceeding. Those ideas, we think, can reasonably be deduced from the spirit, if not the letter, of the 56th Admiralty Rule. Certainly that spirit finds support in the Federal Rules of Civil Procedure, 28 U. S.C.A.
 
 
 44
 The decree of the District Court, in so far as it exonerates the Haiti and holds the Duke solely responsible for the collision, is affirmed. That part of the decree which denies the impleading of the Commission by the other claimants in the limitation proceeding is reversed. And the case is remanded to the District Court for further proceedings in conformity with this opinion.
 
 
 45
 Affirmed in part; reversed in part and remanded.