**IRON ORE TRANSPORT CO., Ltd., as Owner of the STEAM VESSEL RUTH LAKE, Plaintiff,**

**v.**

**The STEAM VESSEL FLYING FOAM, her engines, boilers, tackle, apparel, etc., and American Export Isbrandtsen Lines, Inc., Defendants.**

**Civ. A. No. 6219.**

United States District Court, E. D. Virginia, Norfolk Division.

Sept. 16, 1971.

Baird, Crenshaw & Ware, Crenshaw, Ware & Johnson, Norfolk, Va., for plaintiff.

Seawell, McCoy, Winston & Dalton, Norfolk, Va., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This controversy involves a collision between the RUTH LAKE, owned and operated by Iron Ore Transport Co., Ltd., and the FLYING FOAM, owned and operated by American Export Isbrandtsen Lines, Inc., which occurred on May 7, 1967, at approximately 0246 E.D.S.T. in the international waters off the coast of Virginia. The RUTH LAKE departed Baltimore in ballast on the afternoon of May 6, 1967, bound for Charleston, South Carolina. She had picked up a Chesapeake Bay pilot who left the vessel at approximately 0203 on May 7, 1967, at the pilot ship. She commenced her sea voyage at about 0230. The FLYING FOAM departed San Juan, Puerto Rico, on May 4, 1967, bound for Norfolk, Virginia. She was inbound at the time of collision, with the RUTH LAKE being outbound.

We hold, for reasons stated herein, that there was mutual fault on the part of the two vessels. Damages will accordingly be divided.

The RUTH LAKE is a large ore carrier of 21,156 gross tons,[1] with a length of 661 feet and a beam of 87 feet. When she proceeded outbound via Chesapeake Bay, there was light rain. The gyro compass was on but it had an easterly error of 5 degrees. The captain took the conn after the statutory pilot left the ship. Visibility was estimated by one witness at from 4 to 5 miles, and by another witness at 5 to 7 miles, in rain; the calculation of the latter estimate being at 0207. Captain Yung Ling, the master of the RUTH LAKE, had a Canadian master's license but no radar endorsement. The mate on watch, Shiau, likewise had no endorsement on his license and had never taken a training course.

At 0211 full speed of 16 knots was ordered. At 0220 the lookout was called back from the bow and stationed on the wing of the bridge, a distance of 225.5 feet farther aft. At 0230 the RUTH LAKE commenced her sea voyage. The mate on watch checked to see if cross bearings could be used, but found that the rain had impaired visibility to an estimated 3 miles. The mate proceeded to the chart room to fix the ship's position and gave the order to secure one of the steering motors.

At 0220 the lookout spotted one white light. At 0232 he reported spotting lights on the starboard bow, but the master was unable to make a visual sighting as the rain had obscured his vi-

---

[1]. Captain Ling testified that the gross tonnage was 21,156.14. The post-trial brief of the RUTH LAKE refers to 31,157 gross tons. While we deem the point immaterial, we accept Captain Ling's testimony and assume that counsel are in error.

sion. Radar observation put the observed ship at a range of 6 miles.

The master of the RUTH LAKE estimated that, at approximately 0237, the white lights of the approaching vessel (later discovered to be the FLYING FOAM) were spotted visually by the mate who saw two white lights with his binoculars, but again the captain could not locate the lights as they had disappeared. Radar at this time put the distance at 3 miles on the starboard bow of the RUTH LAKE.

The captain of the RUTH LAKE was of the opinion that the bearing of the approaching vessel was changing to the starboard of the RUTH LAKE, and that there was no danger of a collision. The mate reported that the bearing was opening. The rain increased, but no plots were made of the course of the vessel sighted on radar. Only relative bearings at 6 and 3 miles were obtained, and the master of the RUTH LAKE did not again look at the radar after sighting the other vessel at 3 miles. The master did not put the RUTH LAKE on automatic pilot as he wanted to clear the other vessel before switching off manual control.

At no time did the RUTH LAKE blow any fog signals; nor did she hear any such signal although the lookout reported fog and bad weather.

The FLYING FOAM, under command of Captain Friend, had a draft of 11′ 2″ forward and 15′ 10″ aft. While she had 659 long tons of general cargo aboard, this was considered a "light condition" for this vessel, it being a standard C-3 freighter of 492 feet in length with a beam of 69 feet, and of 7,821 gross tons. There was a full watch set, including an officer, quartermaster, lookout on the bow, and various engine room personnel. In accordance with previous instructions, the master had been called at 0115.

The radar on the FLYING FOAM was inoperative and could not be repaired on board. The part required to correct the defect was not customarily carried at sea. The fathometer had been inoperative at least since December, 1966, when Captain Friend came aboard.

There was an area of disagreement regarding estimates of visibility among those standing watch aboard the FLYING FOAM. This is based on the fact that there were no objects in sight and the fog was rolling in and out in banks.

Landfall was made at 2253 on May 6 when the Bodie Island Light was sighted at approximately 19.6 miles. Between midnight and 0100 on May 7 the lookout and helmsman reported sighting at least one and perhaps two ships. At 0100 McGovern took the lookout watch on the bow. Anderson, the third mate, sighted Currituck Light at 0103 at 10 to 11 miles with binoculars, with visibility on ships at 6 to 7 miles. After the captain was called at 0115 a buoy was spotted at about 0120. At 0136 the FLYING FOAM had False Cape Buoy 4A about 1000 feet abeam. Rain and fog began at this time and visibility on shore lights was estimated at 6 to 7 miles. The FLYING FOAM changed course at this time to 341 degrees to stay to seaward of buoy 2CB, then approximately 17 miles away. At 0215 the vessel altered her course to 345 degrees.

The third mate, Anderson, testified that no buoy was reported or seen between 0136 and the sighting of buoy 2CB. McGovern, the lookout, states that he saw a flashing red buoy shortly after sighting the False Cape buoy. There is a wreck buoy between False Cape and 2CB, which is apparently what McGovern observed. By 0200 the fog was getting heavier and banks were rolling in and out.

At 0224 a rough bearing was taken by radio but there was considerable interference. At 0230 the FLYING FOAM commenced blowing fog signals by hand. Visibility was reduced, according to the third mate, with a glow around the

lights. The lookout gave a low estimate of visibility at from one to one and one-half miles.

The order was given to reduce to full ahead maneuvering speed of 12 knots at either 0230 or 0232. Shore lights were no longer visible. The master estimated visibility at 3 to 4 miles. At 0237 the FLYING FOAM did not know her position. The helmsman suggested that visibility worsened after 0232, but he was not sure of this statement. There was no navigational aid to assist in judging visibility, but the usual visibility of buoy 2CB was 5 miles with no fog. Just prior to sighting buoy 2CB at 0242, the mate was sent to the chart room to fix a position by radio bearing. This was the only time he went to the chart room at 0200, but the master went there at 0230 to estimate when buoy 2CB should be sighted.

When buoy 2CB was sighted at 0242, the master said it was "a mile or so dead ahead." The mate declined to make an estimate. The lookout calculated one-quarter of a mile. Fog was very thick at the time.

Captain Friend gave the order to bring the vessel hard right from 345° to 005° at 0242 to pass buoy 2CB to port. No signal was sounded by the FLYING FOAM to indicate the navigational change, and no vessel had been sighted by the FLYING FOAM at the time. At 0245 the order was given to reduce speed to slow ahead, about 4 knots. Within the intervening minute the RUTH LAKE was observed close ahead to port at one-quarter of a mile. The lookout expressed the view that the RUTH LAKE and buoy 2CB were seen at almost the same time and at about the same one-quarter of a mile from the FLYING FOAM, with the RUTH LAKE slightly inboard of the buoy.

Obviously, at this time, the ships were *in extremis* and measures taken by the vessels to avoid the collision are largely immaterial. There is no contention by either party that liability should attach by reason of faulty emergency proce-

dures at this point. The RUTH LAKE collided with the port quarter of the FLYING FOAM in the area of the after end of her No. 5 hold and steering engine room.

When the collision occurred at 0246 the speed of the FLYING FOAM was estimated at 8 knots. Her stopping distance at 12 knots is one-half mile according to tests run under similar conditions after the collision. The stopping distance of the RUTH LAKE is more difficult to determine. She travels through the water approximately seven-tenths of a mile in 3 minutes while proceeding at full speed. At a steady rate of deceleration, the RUTH LAKE would stop in three-fourths of a mile in 6 minutes. The RUTH LAKE at no time decreased her speed from 16 knots until the vessels were *in extremis*.

Buoy 2CB is a flashing white light powered by 200 candle power at an average height of 15 feet above water. It is the largest type buoy in use, being 9 feet in diameter and 38 feet in length, equipped with a radar reflector attached to it. It is known as the Chesapeake Bay approach buoy as it marks the focal point for all deep-draft vessels entering or leaving Chesapeake Bay or Hampton Roads. It is the "Times Square of the South" and is acknowledged to be located in the area of heavy water traffic.

■ We have no difficulty in condemning both vessels under the circumstances of this case. Captain Friend of the FLYING FOAM admitted knowledge of the fact that he was coming into "restricted waters," by which he meant where there was "a lot of traffic." With limited visibility and an inoperable radar and fathometer, and with no assurance of his position until 4 minutes prior to the collision, he proceeded at full speed. His reduction of speed to slow ahead at 0245 had very little effect upon the speed insofar as it related to the collision. In Villain & Fassio E. Compagnia v. International Di Genova Societa, Riunite Di Navigazione, SPA Tank Steamer E. W. Sinclair, 313 F.2d

722, 723 (2d Cir. 1963), the court condemned a speed of 11½ knots under somewhat similar circumstances, although visibility was perhaps more limited, where it said:

> "The Sinclair was plainly guilty of faulty navigation in proceeding into heavy fog, with visibility of rarely more than half her length, with her radar out of order, in and near a heavily traveled channel, at so high a speed."

While the facts in United States v. M/V Werttemberg, 330 F.2d 498, p. 503 (4 Cir. 1964), are quite different, the language of Judge (now Chief Judge) Haynsworth seems peculiarly appropriate where he said:

> "The pilot had every reason to realize that visibility was tremendously reduced, and that, without radar, he was proceeding blindly into a situation which might call for close passage with other outbound vessels. That he did not go to slow ahead or take other precaution, when he had abundant reason to believe that visibility had been reduced to the danger point, warranted the District Court's conclusion of fault on the part of the Wuerttemberg. The original reduction of speed to half ahead may not have been incautious if taken early enough, but when the landmarks could not be seen when the Wuerttemberg had approached to within less than one mile of them, further action was required."

Under normal visibility buoy 2CB would have been sighted at approximately 0221. As noted above, the buoy was finally sighted at 0242—21 minutes later—and then to the starboard and not off the port bow. This is what prompted Captain Friend to give a hard right order at 0242.

In the landmark case of British Transport Commission v. United States, 230 F.2d 139 (4 Cir. 1956), affd. 354 U. S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957), the appellate courts accepted a finding by the district judge, Petition of United States 131 F.Supp. 712, 715 (D. C.), where he said:

> "The Duke was running through a 'patchy' fog—'very thick at times' and then fairly clear intervals. She was piercing one fog bank after another . . . From 3 A.M. on, the fog was 'very thick' . . . In such weather the speed of the Duke of York was too fast for good seamanship; it violated the 'moderate speed' injunction in the fog rules of Article 16, International Rules, 33 U.S.C.A. § 145N. It was an overriding and major fault; collision was a foreseeable result . . . At 0412 and up to the collision, visibility was ¼ mile, the captain, his mate and lookout have said, and even in this interval the speed was 12 knots, half ahead. Not until the Haiti Victory was sighted, the ships ¼ mile apart, and the collision a minute or two off, did the engines go to slow, 6 knots."

What has been said with respect to the fault of the FLYING FOAM is equally applicable to the RUTH LAKE. Both vessels approached a point of heavy traffic at too great a speed under the circumstances here prevailing.

While the RUTH LAKE argues that the FLYING FOAM is solely at fault by reason of the order to go hard right to pass buoy 2CB to port, we cannot agree that this was the only major fault involved. In Standard Oil Company of California v. S. S. Rotti, 286 F.Supp. 677 (N.D.Cal.1967), aff'd per curiam sub. nom. N. V. Stoomvaart Maatschappij "Nederland" and the S. S. Rotti v. Standard Oil Company of California, adopting the opinion of the district court, 398 F.2d 835 (9 Cir. 1968), cert. den. 393 U.S. 980, 89 S.Ct. 448, 21 L. Ed.2d 441 (1968), the situation confronting the S. S. ROTTI was virtually identical with that of the RUTH LAKE, the only material difference being that the vessel in collision with the ROTTI conceded its fault. Indeed, the ROTTI had even stronger grounds than the RUTH LAKE in urging that she acted prudently. Without detailing the facts

in *Rotti*, it is sufficient to state that, after knowledge that another vessel was outbound and the ROTTI inbound and having seen the vessel on her radar, she proceeded at an immoderate speed in a fog situation in violation of Rule 16(a) of the International Rules for Preventing Collisions at Sea. The condemned speed of the ROTTI was 12 knots; the speed of the RUTH LAKE was 16 knots, and she was admittedly not sounding any fog signals. The RUTH LAKE has not overcome the heavy burden imposed by the rule in THE PENNSYLVANIA, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873), occasioned by the statutory faults of immoderate speed and no fog signals. Equally at fault was the FLYING FOAM with no operative radar and no knowledge as to her whereabouts until 0242–4 minutes prior to the collision—when she sighted buoy 2CB "a mile or so dead ahead" or perhaps only one-quarter of a mile as estimated by the lookout. It was at this point that the FLYING FOAM altered her course to starboard in order to pass the buoy to port. She was then proceeding at 12 knots and it was not until one minute prior to the collision that an order was given to reduce speed to slow ahead, about 4 knots. What has been said as to the speed of the RUTH LAKE applies with equal force to the FLYING FOAM.

We do not believe that the major-minor fault rule as enunciated in the City of New York, 147 U.S. 72, 85 (1893), can be invoked by either vessel. As indicated by THE VICTORY & THE PLYMOTHIAN, 168 U.S. 410, 424, 18 S.Ct. 149, 42 L.Ed. 519 (1897), the determination of this issue is frequently a close question because subsequent knowledge of what might have prevented disaster tends to qualify the inquiry as to the prior duty to avert it. However, with respect to the RUTH LAKE and FLYING FOAM, we see no element of closeness. Both vessels were guilty of major faults.

We see no need to enter into any discussion of the failure of the RUTH LAKE to use her radar intelligently by plotting the course of the other vessel, although it would have been prudent to do so. It appears that, even without the course change by the FLYING FOAM, the crossing of the vessels would have been dangerously close, and it does not follow that the collision could necessarily have been averted to the extent of exonerating the RUTH LAKE from faulty navigation. We should also note that, at 0220, the lookout was called back from the bow of the RUTH LAKE and stationed on the wing of the bridge. Perhaps he could see better, and perhaps he could not, but at least he was 225 feet farther aft. These factors we would mention in detail if the controlling decision rested upon either point. However, with respect to the RUTH LAKE, we prefer to rest the judgment on immoderate speed and no fog signals, all with knowledge of the fact that another vessel was in the area of heavy water traffic. The fault of the FLYING FOAM is obviously clear in that, although fog signals were sounded, the speed was excessive with no operable radar, fog, and limited visibility, combined with a course change only 4 minutes prior to the collision, which change was not accompanied by any signal.

We know, of course, that the "visible distance" rule of "moderate speed" should not be applied blindly, but where there is knowledge, either actual or constructive, of the presence of other vessels in the vicinity—actual knowledge of the RUTH LAKE and constructive knowledge of the FLYING FOAM—with the limited visibility here shown, the speed may well be immoderate regardless of whether the "visible distance" test of moderate speed is applicable or not. Gertrude Parker, Inc. v. Abrams, 178 F.2d 259, 264 (1 Cir. 1949).

A decree may be presented dividing the damages and referring the matter to a commissioner for an appropriate reference, allowing a reasonable time, not exceeding 120 days, for the parties to attempt to agree upon the total damage.